**MUELLER BRASS CO.**

v.

**READING INDUSTRIES, INC.**

**Civ. A. No. 68–1996.**

United States District Court,
E. D. Pennsylvania.

Dec. 21, 1972.

terclaimed for treble damages under Section 4 of the Clayton Act (15 U.S.C. § 15) alleging a violation of Section 2 of the Sherman Act (15 U.S.C. § 2). In February of 1970, Mueller Brass attempted to limit its action to claims 3 and 4, a limitation in which Reading has never acquiesced.

The counterclaim for declaratory judgment was proper, and served to hold the validity of all four claims in issue. Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450 (1949). Having been sued on claims 1 and 2 initially, defendant need not wait to be sued again. Because of this, it is unnecessary to decide if dropping two of four patent claims is the dismissal of an action requiring agreement of both parties under Federal Rule Civ.Proc. 41(a).

Don K. Harness, Richard E. Dibner, Harness, Dickey & Pierce, Detroit, Mich., for plaintiff.

Arthur H. Seidel, William W. Schwarze, Seidel, Gonda & Goldhammer, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

NEWCOMER, District Judge.

This patent infringement action was instituted by Mueller Brass Co., a Michigan Corporation. Mueller Brass is the record owner of U. S. Letters Patent No. 3,247,747, originally issued to John Fueslein, et al. September 27, 1966. The defendant is Reading Industries, a Delaware Corporation with offices and manufacturing facilities in Reading, Pennsylvania where the alleged infringements occurred. The case is therefore properly before the Court under 28 U.S.C. § 1338, and venue is proper under 28 U.S.C. § 1400.

This action was originally brought alleging infringement of all four claims of the patent in suit. Defendant, Reading, counterclaimed for a declaratory judgment under 28 U.S.C. § 2201 that all four claims are invalid, and also coun-

## SCOPE OF THE PATENT

The first step in deciding a patent case is to decide the scope of the patent in suit. The patent law has its own jurisprudence and rules of construction, and like other areas of the law, there are major lines of decisions which have given rise to principles which appear, on the surface, at any rate, to be contradictory. Thus, some cases hold that patents are to be liberally construed in favor of the validity of the patent, that patentees are allowed much latitude in their language, that the specification should be resorted to in cases of ambiguity to interpret the meaning of the language of the claims, and even that the wording of the claims may be rendered ambiguous by a difference between the language of the claims and the supporting drawings, an ambiguity which should be resolved to uphold the patent. This general line of thought is typified by the statement that a patent ought not to be defeated by "technical adherence to the letter of the statute, or by the application of artificial rules of interpretation." Topliff v. Topliff, 145 U.S. 156, 172, 12 S.Ct. 825, 831, 36 L. Ed. 658 (1891). See generally Strong-Scott Manufacturing Co. v. Weller, 112

F.2d 389 (8th Cir. 1940) and Deller's Walker on Patents, 2d Ed., § 226.

Another line of cases takes a hard line against resort to the specification of a patent either to expand a claim to cover accused activity or to contract it to avoid prior art. The progenitor of this line may be taken to be White v. Dunbar, 119 U.S. 47, 51–52, 7 S.Ct. 72, 74, 30 L.Ed. 303:

> "Some persons seem to suppose that a claim in a patent is like a nose of wax, which may be turned and twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express. The context may, undoubtedly, be resorted to, and often is resorted to, for the purpose of better understanding the meaning of the claim; but not for the purpose of changing it and making it different from what it is. The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms. This has been so often expressed in the opinions of this court that it is unnecessary to pursue the subject further."

The quoted language is not without its problems, however, in that it is often difficult to tell the difference between resorting to a claim to better understand a term from its context, and changing the meaning of the word. Many of the cases resorting to the specification came after White v. Dunbar and merely resorted to the context of the specification to conclude that an ordinary English word meant something other than its apparent English meaning. The problem with ambiguity as a standard for resort to the specification is that virtually all language has some degree of ambiguity.

The growth of the hard line rationale is typified by the following quote from In re Levy, 55 App.D.C. 137, 2 F.2d 939,

a 1924 case of the Circuit Court for the District of Columbia sitting on an appeal from a patent office rejection of a patent application:

> "The party who states his claims before the Patent Office in broad language is not in a position, when thrown into interference, to read limitations into them. The reason is obvious. If he has asked too much, he may reform his claims in an appropriate proceeding. When he takes claims broader than his invention, however, he thereby is enabled unduly to harass the public."

To the same effect: Nichols v. 3M Co., 109 F.2d 162 (4th Cir. 1940), In re Henschell, 90 F.2d 357 (Cust. & Pat. App., 1937), In re Kuhrts, 95 F.2d 325, 25 C.C.P.A., Patents, 1043 (1937), and In re Gillis, 102 F.2d 902 (Cust. & Pat. App., 1939).

To be sure, the early development of the hard line was in cases involving the denial of appeals from Patent Office rejection and there are different considerations involved in an appeal from the denial of a patent and in determining the scope of an issued patent, but in 1948 the Supreme Court adopted the hard line in the latter circumstance in Graver Tank & Manufacturing Co. v. Linde Air Prod. Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672, where Mr. Justice Jackson wrote for a unanimous Court:

> "The difference between the District Court and the Court of Appeals as to these findings comes to this: The trial court looked at claims 24 and 26 alone and declined to interpret the terms 'silicates' and 'metallic silicates' therein as being limited or qualified by specifications to mean only the nine metallic silicates which had been proved operative. The District Court considered that the claims therefore were too broad and comprehended more than the invention. The Court of Appeals considered that because there was nothing in the record to show that the applicants for the patent intended by these claims to as-

sert a monopoly broader than nine metallic silicates named in the specifications, the court should have construed the claims as thus narrowed and limited by the specifications. . . . We have frequently held that it is the claim which measures the grant to the patentee. (citations omitted) While the cases more often have dealt with efforts to resort to specifications to expand claims, it is clear that the latter fail equally to perform their function as a measure of the grant when they overclaim the invention. When they do so to the point of invalidity and are free from ambiguity which might justify resort to the specifications, we agree with the District Court that they are not to be saved because the latter are less inclusive. (citations omitted)" Id., at 276–277, 69 S.Ct. at 538.

While it is true that the Court in *Graver Tank* was dealing with an attempt to resort to the specification to avoid invalidity for failure to particularly claim the invention in question, it is clear that the same principles apply when the attempted resort to the specification is for the purpose of avoiding the prior art. As Judge Learned Hand said in Foxboro Co. v. Taylor Instruments Co., 157 F.2d 226 (2d Cir., 1946):

"We should have no warrant for limiting the claims by the elements of the disclosure which they do not include, even if the elements were new. A patentee who claims broadly must prove broadly; he may not claim broadly, and recede as he later finds that the art unknown to him has limited his invention. That is the chance he must take in making broad claims;" Id., at 232.

*Graver Tank* does not really over-rule previous cases resorting to specifications to contract claims, but it does imply that a more severe standard of linguistic ambiguity must be applied than previous Courts had done in the past.

A Court should consider how ambiguous the claimed ambiguity really is, and how difficult a task it would have been to make the claim read literally what it is urged to mean by reference to the specification. People who draw patents sometimes yield to the temptation to claim broadly, with a ready retreat to the narrowness of the specification planned if the patent comes under heavy attack. Their escape hatch is a word claimed to be ambiguous. If the ambiguity could have been avoided with reasonable ease initially, such bet-hedging should not be allowed, and the Court should give the word in question in the claim its normal English meaning unlimited by the narrow language of the specification.

It is with these considerations in mind that we turn to an examination of the claims of the patent in suit. They are short enough to be conveniently reproduced here in their entirety and they claims as follows:

1. A method for maintaining the interior of tubular members devoid of contamination and deposits for prolonged periods of time which comprises the steps of cleaning the interior of the members to remove undesirable deposits from the inner surfaces thereof, purging the interior of the cleaned said members with a substantially moisture-free inert fluid, and thereafter sealing said inert fluid in the interior of said members.

2. A method for maintaining the interior of tubing devoid of contamination and undesirable deposits for prolonged periods of time which comprises the steps of cleaning the interior surfaces of the tubing to remove undesirable deposits therefrom, drying and purging the interior of the cleaned said tubing, introducing a substantially moisture-free inert fluid into the tubing, and thereafter sealing said inert fluid within the interior of said tubing.

3. A method for maintaining the interior of tubing devoid of contamination and moisture for prolonged periods of time which comprises the steps of cleaning the interior of the tubing to remove foreign matter

from the inner surfaces thereof, drying the interior of said tubing to remove substantially all of the moisture therefrom, purging the interior of the dried and cleaned said tubing with a substantially moisture-free inert fluid, and thereafter sealing the ends of said tubing to entrap said inert fluid therein at a pressure greater than the pressure of the surrounding atmosphere.

4. A method for maintaining the interior of refrigeration and air conditioning tubing devoid of contamination and moisture for prolonged periods of time which comprises the steps of cleaning the interior of the tubing to remove foreign matter from the inner surfaces thereof, drying the interior of the cleaned said tubing, pressurizing the interior of said tubing with an inert fluid to a pressure above atmospheric pressure, and thereafter sealing said pressurized inert fluid within the interior of said tubing.

The plaintiff has urged that the patent in suit is narrower in many respects than the language of its claims suggest. Specifically, plaintiff urges that the patented process applies only to hard-drawn large-diameter copper ACR [1] tubing, that the sealing means indicated by the claims is limited to rubber or plastic deformable plugs, and that the term "inert fluid" means only nitrogen, and that these revelations may be had by reference to the specification. The Court is unpersuaded; first, because none of the language employed in the claims is very ambiguous, and second because as regards every asserted limitation save two, the specification by its own language is no more restricted than the claims, each reference to the alleged limiting factor being clearly exemplary, insofar as it is present at all.

The two limitations urged by plaintiff which gain some support from the language of the specification are that the word "seal" as used in the claims means "seal by rubber or plastic deformable plugs" and that the word "fluid" means "gas."

As to plaintiff's contention that the third and fourth lines from the bottom of page 7 of the specification establish that the word "seal" in its various forms as used in claims 1–4 of the patent in suit means only to seal by means of rubber or plastic plugs, it is true that the language found there does not seem to be setting out only an example. The passage in question reads in pertinent part:

"One end of the substantially dry purged tubing containing inert gas is thereafter sealed employing a sealing plug of the *type* shown in the drawings . . ." (emphasis supplied)

Plaintiff makes a dangerous argument. It would like the Court to hold that the word "type" narrows the means of sealing to plugs to avoid the prior art, but doesn't narrow it all the way down to plugs of the design "shown in the drawings" which would let everyone out of the infringement net who used a rubber plug of a different design. The word "type" here is more ambiguous than anything in the claims.

It is unnecessary to resolve this dilemma however. This Court finds the word "seal" as used in the claims no more ambiguous than was the word "silicate" in the claims under scrutiny in *Graver Tank.*

The Court is unimpressed by plaintiff's argument that the phrase "sealing the ends of said tubing" as used in claim 3 necessarily negates crimp sealing since a crimp seals the end and a portion of the tube slightly inboard of the very very end. This is mere semantic straining. Having viewed the crimp seals of the exhibits introduced at

---

1. ACR is a term of art in the tubing industry which refers to hard-drawn straight-length medium to large diameter copper tubing manufactured according to stringent standards of quality relating to, inter alia, bore smoothness and imperfection, cleanliness, etc. ACR tubing, as a sep-arate product, was not manufactured until 1960. Before this time, most industrial air-conditioning and refrigeration installations using hard drawn large diameter copper tubing seem to have been done with the tubing industry's standard quality tubing of that type.

trial, it is obvious that anyone seeing them would say that they seal the ends of the tubing. Further, the point of seal of a rubber plug is also inboard of the very very end.

The plaintiff also argues that a crimp and solder seal would not work in claims 3 and 4, because the pressure of the inert fluid within the tube would blow the solder out before it hardened to a pressure tight seal. However, crimp and solder seals proper to the claimed process could be accomplished in a pressure chamber where the pressure on both sides of the solder was equalized. Although no one has developed such a process within the industry, if developed it would read on the patent. Further, the exclusion of crimp and solder seals from claims 3 and 4 would still leave various valves and fittings for sealed closure besides rubber or plastic plugs, and the claims are so broad that various applications of tubing thus prepared now or in the long life of the patent are not excluded from its scope, and the Court cannot say that they are unlikely.

"Seal" means to close to the degree required by the process, by whatever means. It does not appear to have been limited to the use of rubber or plastic plugs in the claims. The claims appear to have been drawn broadly to claim broadly. Had a narrower meaning than the obvious one been intended for the word "seal" it would have been wonderfully easy to have said so. For better or worse, the patentees chose to use the word seal unmodified in the claims, and it appears to this Court that the choice was intentional. Their assignee will not now be allowed to retreat to a narrower reading than the obvious by reference to the specification, especially when the now-claimed limitation is not even present in the specification directly, but only by implication from the construction of one sentence in the specification.

Similarly, the Court finds the word "fluid" used in the claims too unambiguous in the language of science and engineering and too easily modified had

that been intended, to resort to the claims and assign it the meaning "gas," or "nitrogen."

Accordingly, the Court finds that the claimed invention is broadly directed to a method for maintaining the interior of tubing or tubular members devoid of contamination and undesirable deposits for prolonged periods of time. None of the claims specify any particular kind of tubing or tubular member which is to be so maintained, except that claim 4 refers to "refrigeration and air conditioning tubing" without further specifying any particular kind of refrigeration and air-conditioning tubing. Many different kinds of tubing have refrigeration and air conditioning applications, and the term "refrigeration and air conditioning tubing" in claim 4 does not limit the claim to large diameter hard-drawn straight-length copper tubing (known in the trade as ACR tubing) but includes soft temper copper tubing of any size with common refrigeration or air conditioning applications, and tubing of any other material with common refrigeration or air conditioning applications, such as stainless steel or plastic tubing.

None of the claims of the patent in suit is limited as to the size of the tubular members or tubing to which the claimed method is directed. Even though claim 4 is limited to refrigeration and air conditioning tubing, such tubing ranges from the small diameters of capillary tubing to diameters of several inches.

None of the claims is limited to any particular configuration of tubing or tubular members. Various configurations of tubing were known prior to the alleged invention, including coils and straight lengths, and, with reference to claim 4, they had been used in refrigeration and air conditioning applications.

None of the claims is limited to any particular method of cleaning, and it is only specified that undesirable deposits or foreign matter be removed from the interior surfaces of the tubing.

None of the claims is limited to any particular method of drying, and claim 1 does not require drying at all, even though a tube treated according to claim 1 must be filled with dry inert fluid.[2]

The term "purge" as used in the claims means to displace and replace the original oxygen and moisture bearing atmosphere within the tubing with an atmosphere of pure dry inert fluid. It is true that the word "purge" in claim 2 is not directly related to the inert fluid. Still, as no other purging medium is revealed, the interpretation of the court appears most reasonable.

Claim 4 does not appear to require a purging step. This is somewhat problematical. How else except by purgation does the original oxygen bearing atmosphere within the tube depart? The Court supposes that some sort of vacuum device might be utilized to avoid direct displacement by the inert fluid. However, no such process was ever intimated by plaintiff at any time, or by defendant for that matter. It seems more reasonable to the Court that the inclusion of the filling-pressurizing step in claim 4 right after the drying step makes purgation present by necessary implication, since one cannot fill the interior of tubing completely with dry inert fluid without purging the atmosphere which was present before such filling.

None of the claims is limited to any particular type of inert fluid, the only requirement being that the fluid be inert to the interior surfaces of the tubing under the conditions of transport and field handling normally encountered by whatever kind of tubing is prepared by the claimed method. Moreover, since the word "fluid" includes both gases and liquids, none of the claims is limited to the use of a gas.

None of the claims is limited to any particular method or means of sealing the inert fluid within the interior of the tubing or tubular members, such as by plugs.

Only Claims 3 and 4 require that the inert fluid be sealed within the tubing at a pressure greater than atmospheric pressure, and neither of these claims specify how much greater such pressure shall be than the surrounding atmosphere.

## PRIMA FACIE INFRINGEMENT

The Court finds no merit in defendant's contention that its accused method does not infringe the claims of the patent in suit. Defendant argues that, since it plugs its tubing and then pressurizes with nitrogen through a hypodermic-like needle after sealing, it does not pressurize then seal as in claims 3 and 4, but rather seals then pressurizes. However, it appears that the final sealing does not take place until withdrawal of the needle and is the result of the self-sealing characteristics of the plug rubber. This would seem to the Court to be within the scope of pressurizing, then sealing as described in claims 3 and 4 of the patent in suit. This Court concludes that defendant's accused method infringes each of the four claims of the patent in suit. Therefore, the defendant is liable for damages for infringement of claims 3 and 4 (the only claims plaintiff now presses), unless the patent is in some way invalid.

## PRESUMPTION OF VALIDITY OF AN ISSUED PATENT

If a defendant seeks to avoid paying damages for the infringement of a patent by claiming that the patent is void because of anticipation by the prior art under 35 U.S.C. § 102 or obviousness from the prior art under 35 U.S.C. § 103, he must prove these contentions. It is a commonplace of patent law that there is a strong presumption of validity attaching to an issued patent, but that if the best prior art was not before the patent examiner when the patent was approved, that presumption is greatly weakened. *See* Graham v. John Deere

2. This does not mean that the dry inert fluid was intended to go into a wet tube—this claim was probably intended to cover possible methods of drying the tube first, then cleaning it by moisture free methods.

Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The word "presumption" is probably the most abused term of art in the entire lexicon of the law. See Ashford and Risinger, Presumptions, Assumptions and Due Process in Criminal Cases. A Theoretical Overview, 79 Yale L.J. 165 (1969). In this context in the patent law, "presumption" appears to mean that a judge should use great restraint in finding something obvious, anticipated, etc., in hindsight when the patent examiner who originally approved the patent is an expert having daily contact with the subject matter of the patent law and the art, and the judge is not.[3] However, if the examiner did not consider the best prior art, then of course, the trial judge is thrown back on nothing more than his own best judgment concerning the implications of that prior art, since it was never passed on by the examiner.

In the present case, the Court notes that the two prior art references which the Court considers both the best prior art and dispositive were not considered by the Patent Office.

## LEGAL STANDARDS OF ANTICIPATION AND OBVIOUSNESS

■ In order to establish anticipation under 35 U.S.C. § 102, it must appear that every material element of the claim in question was disclosed by a single prior art reference.[4] As was said in Cold Metal Process Co. v. Carnegie Illinois Steel Corp., 108 F.2d 322 (3rd Cir., 1939) cert. den. 309 U.S. 665, 60 S.Ct. 590, 84 L.Ed. 1037 (1940):

> "A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit. Otto v. Linford, 46 L.T.(N.S.) 35, 44, it

is not enough to prove that a method or apparatus described in an earlier specification can be made to produce this or that result. Flour Oxidizing Co. v. Carr & Co., 35 R.P.C. 457. A singularly sensible test of the rule of anticipation is given in British Thomson-Houston Co. v. Metropolitan Vickers Electrical Co., 45 R.P.C. 22, by asking the question—'Would a man who was grappling with the problem solved by the patent attacked, and having no knowledge of that patent, if he had had the alleged anticipation in his hand, have said: 'That gives me what I wish?'' "

For similar language, see Judge Hannum's recent opinion in Congoleum Industries, Inc. v. Armstrong Cork Co., 339 F.Supp. 1036 (E.D.Pa., 1972).

■ In order to establish obviousness under 35 U.S.C. § 103, it must appear that the state of the relevant prior art was such that the claimed invention would have been obvious to one of ordinary skill in the art in question. The proper approach to the problem was outlined by the Supreme Court in Graham v. John Deere, supra, 383 U.S. at p. 17, 86 S.Ct. at p. 694, where the Court said:

> "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined."

It appears from the evidence that people who are charged with concerning themselves with improvements in tubing and tube-making procedures by tubing companies are generally graduate engineers who have staffs of non-engineer technicians who are at least high school

---

3. The actual strength to be accorded to this "presumption" was undermined by the Supreme Court itself in *Graham*, supra, 383 U.S. at p. 18, 86 S.Ct. 684, where the Court levelled sharp criticism at the leniency of the Patent Office in finding invention where there is none.

4. There may be some circumstances not relevant here where it is proper to combine references under § 102. See Package Devices, Inc. v. SunRay Drug Co., 432 F.2d 272 (3rd Cir., 1970).

graduates and often have post-high school education. Generally the ideas come from the engineers and are tested or reduced to practice by the technicians. This is not to say that the technicians never have valuable ideas—they probably do. But in judging the "ordinary level of skill" in the art, it is the level of skill of those who normally attack the problems of the art that counts, and those who do most of the problem solving in tube-making research and development are graduate engineers. As such they are chargeable with certain general knowledge concerning the principles of engineering, outside the narrow field of tube-making, and with the skills, ingenuity and competence of the average professional engineer.

## ANTICIPATION AND OBVIOUSNESS IN RELATION TO CLAIMS 1 & 2

The only prior art which need be discussed with reference to claims 1 and 2 of the patent in suit is the 1933 U.S. Patent No. 1,916,474 to F. W. French, et al., for a method of making copper and copper alloy tube, which was not considered by the Patent Office (hereinafter referred to as "French"). French revealed:

"Filling a drawn metal tube with a non-oxidixing gas or a gas which will have no effect on the tube, and then sealing the ends of the tube to retain the gas therein, [so that] the inner surfaces of the tube can be maintained clean, bright, and dry during subsequent manufacturing operations and until the tube is actually placed in service by the user."

Claim 1 of the patent in suit teaches cleaning tube, purging tube with inert fluid, and sealing the inert fluid inside, to keep it clean inside until use.

Claim 2 of the patent in suit teaches cleaning tube, drying tube, purging tube with a dry inert fluid, and sealing the inert fluid inside to keep it clean and dry inside until use.

The French patent teaches taking clean dry tube and filling it completely with inert fluid, thereafter sealing the inert fluid inside to keep the tube clean and dry through various manufacturing processes and up to initial use.

It is true that French does not specifically spell out any purgation, but purgation is a corollary of filling the tube completely with inert gas, as was explained in relation to claim 4 of the patent in suit above.

It is also true that French does not spell out the steps of cleaning and drying. This is because the tubing in French was nitrogen charged at a point in its manufacture when it was clean and dry. But cleaning and drying steps added to the beginning of this process cannot create patentability. Cleaning and drying are conceded to be old in the tubemaker's art. In this context there is no difference between saying "clean a tube and dry a tube" and saying "take a clean, dry tube."

It might be argued that there is no reference in French to *dry* nitrogen. However, one object of the process in French was to maintain the tube in a dry condition until ultimate use. No competent engineer would use nitrogen with a dew point high enough to produce moisture contamination under the conditions which might be encountered until use in such a case. The requirement that the nitrogen be dry is present by necessary implication.

■ Because of this difference in wording however, plaintiff may argue that the French patent itself is not technically an anticipation of claims 1 and 2 of the patent in suit since an anticipation of a process patent requires that each step in the process or its functional equivalent appear in a single piece of prior art. This Court thinks that the functional equivalent of each step of claims 1 and 2 is revealed by French. However, even if the Court were to rule otherwise on this fine metaphysical question of anticipation under § 102, it is clear that claims 1 and 2 would have been obvious to one skilled in the field of tube-making research and development in light of French under 35 U.S.C.

§ 103. Therefore, claims 1 and 2 of the patent in suit are unpatentable over French and void.

ANTICIPATION AND OBVIOUSNESS
IN RELATION TO CLAIMS 3
AND 4

Turning to claims 3 and 4 of the patent in suit, the only significant way in which they differ from claims 1 and 2 is by the addition of the pressurization of the tubing with the inert fluid utilized. The Court deems it reasonably obvious that the pressurization is to prevent the inmigration of contaminants under varying conditions of temperature and atmospheric pressure which might be encountered during field storage of the tube. The question is, does the addition of the pressurization step render claims 3 and 4 patentable and valid.

The answer is no, and in order to demonstrate this we need discuss only one additional prior art reference. This is the American District Telegraph Co. Manufacturing Specification MS–790 (hereinafter referred to as MS–790) which was known in the industry by at least 1951.

MS–790 reveals taking clean dry small-diameter soft copper tubing, filling it with nitrogen (thereby purging it of oxygen bearing air), pressurizing it with dry nitrogen to check for leaks, then sealing the dry nitrogen inside at pressure above atmospheric to keep it uncontaminated by oxygen or moisture until use The reason for the initial pressurization may have been to check for leaks, but the reason the nitrogen was ultimately sealed in the tube under pressure was to prevent the inmigration of contaminants under such conditions of temperature and atmospheric pressure as might be encountered during storage. This is made abundantly clear in the following excerpt from the deposition of Mr. F. M. Gibson of the Western District Telegraph Company, the man who wrote MS–790:

Q. (By Mr. Seidel) In the course of the procedure described in MS–790, issue No. 3, exemplified by Defendant's Exhibit 32 for identification, previously marked, is the tubing purged with nitrogen gas?

A. (By Mr. Gibson) Yes.

Q. Is nitrogen an inert gas?

A. Yes.

Q. And then is the tubing sealed?

A. Yes.

Q. Did you know of your own knowledge in 1951 whether it was significant that the tubing be sealed in an airtight fashion?

A. Yes.

Q. Was it significant?

A. Yes, it was.

Q. Why?

A. The purpose of sealing the tubing is to prevent the entrance of any dirt or foreign material during the period between its manufacture and installation on a fire detection system.

Q. Was the gas, the nitrogen gas inside the tubing at atmospheric pressure or superatmospheric pressure?

A. Above atmospheric pressure.

Q. Did you know that to be the case in 1951 when you prepared these specifications?

A. Yes, I did.

Q. What was the purpose of having the nitrogen gas at superatmospheric pressure?

A. If the interior of the tubing is above atmospheric pressure, it would be impossible for any dirt to flow against the pressure into the tube.

(Gibson deposition, pages 44 and 45)

Thus MS–790 anticipates the methods claimed in claims 3 and 4 of the patent in suit as completely as French does those in claims 1 and 2. And again, the Court is faced with the same metaphysical dilemma with regard to anticipation under 35 U.S.C. § 102. Here as there, the court finds every material element of claims 3 and 4 present in MS–790, and

finds claims 3 and 4 invalid by anticipation.

█ However, even if we were to conclude that some minor element of claims 3 and 4 was missing from MS–790, it is obvious that claims 3 and 4 are obvious in light of MS–790 and therefore unpatentable under 35 U.S.C. § 103.[5]

It is fairly obvious what happened in this case. The inventors of the patent in suit worked out a way to apply an old well-known method of storing tubing clean and dry until use to large-diameter hard-drawn tubing, which presented some special problems when using the method. Having done this, they proceeded to claim the old well-known method, without any reference to their adaptation of it. This may have been done by oversight, by a greedy attempt to get more than they should, or by ignorance of the prior art. The reasons are immaterial. Clearly all that was claimed in each of the four claims of the patent in suit was old and the claims are therefore invalid. As was said in In re Mraz, 455 F.2d 1069, 1072–1073 (Cust. & Pat.App. 1972):

> "[C]laims are unpatentable when they are so broad as to read on obvious subject matter even though they likewise read on non-obvious subject matter."

Plaintiff claims that the patentability of its claims is proved by commercial success and by defendant's copying. Secondary considerations of commercial success or copying cannot save a patent that is clearly invalid, Graham v. John Deere Co., supra, 383 U.S. at pages 17 and 18, 86 S.Ct. 684.

The Court is inclined to believe that there was little invention involved in the idea of using rubber plugs to adopt the method of MS–790 to hard drawn large diameter tubing. The court notes that the probable reason this had not been done before 1960 in the tubing industry was that ACR tubing itself, as a specific product, was new in 1960.

The air conditioning and refrigeration industry is a child of twentieth century technology. Commercially, it started small. As a small market in terms of the total copper tubing market, it didn't command great "customer services" from the tubing industry initially. Further, it appears that early compressors may have been of low efficiency, but less sensitive to dirt and moisture in the system than later ones, or to the effects of slight imperfections in the tube itself.

With the advent of large scale central air conditioning in the forties and fifties, the air conditioning and refrigeration industry boomed, and became increasingly important as a market for copper tubing, and especially, as installations got larger, large-diameter hard-drawn copper tubing. This tubing was for the most part apparently supplied from the tubing industry's regular production tubing.

As compressors got larger and more efficient problems of dirt and moisture contamination breakdown increased. One of the sources of such contamination was the tubing, and during the 1950's air conditioning and refrigeration people developed elaborate means of cleaning the tubing on the jobsite before installation.

In late 1959 or early 1960, someone at some tubing company (not Mueller Brass Co., however) recognized that (1) the air conditioning and refrigeration industry was now large enough to form a significant large-diameter hard-drawn tubing market by itself, and (2) that field problems were such that the air conditioning and refrigeration industry would be willing to pay a higher initial price for special flawless clean dry tubing which would eliminate some of the field work and contamination breakdown. The idea of ACR tubing was born.

---

5. It should be noted MS–790 anticipates claims 1 and 2 also, perhaps even better than French, because MS–790 is somewhat more specific as to cleaning and drying as processes and makes specific reference to the use of a *dry* inert fluid.

Until this marketing decision was made, no one in the tubing industry would have bothered trying to adopt the methods of MS–790 to large tubing, since it was expensive and of no particular benefit in most applications of regular run tubing.

After ACR tubing hit the market, anyone knowing of MS–790 would have seen that the method of MS–790 would make better ACR tubing, and anyone thinking about how to adapt MS–790 to hard temper large-diameter tubing like ACR tubing would have thought of using some form of cork (read "rubber plug"). The exact form of the plug necessary for successful adaptation might be a patentable invention, but the Court doubts that the adaptation of the method would ever be held unobvious and patentable.

This discussion, however, is somewhat academic, for insofar as there may have been anything patentable in the method of adapting the old processes of French and MS–790 to the specific problems of large-diameter hard tubing, it was not particularly pointed out and distinctly claimed in the patent in suit as required by 35 U.S.C. § 112, and therefore cannot form a basis of validity for the patent in suit. Any way one looks at the patent in suit, it is totally void.

■ Having arrived at this conclusion, we need not consider the rest of defendant's alleged defenses. It becomes manifest that defendant is entitled to its requested declaratory judgment that all four claims of the patent in suit are invalid.

## DEFENDANT'S ANTI-TRUST COUNTERCLAIM

■ Defendant has counterclaimed against plaintiff praying treble damages under Section 4 of the Clayton Act (15 U.S.C. § 15) for violation of Section 2 of the Sherman Act (15 U.S.C. § 2). It is clear under Walker Process Equipment, Inc. v. Food Mach. and Chem. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L. Ed.2d 247 (1965) that the holder of a patent monopoly may be so liable for treble damages under Section 4 of the Clayton Act, if five conditions are proven by the party seeking damages:

First, there must be a knowing, wilful and intentional act of misrepresentation to the patent office (though silence with knowledge of relevant information concerning prior art or inventorship may constitute such an act).

Second, the misrepresentation must be material, that is, it must be shown that the patent would not have issued but for the misrepresentation.

■ Third, the misrepresentation must be such that the Patent Office relied on it, and this reliance must have been reasonable. University of Illinois Foundation v. Blonder Tongue, Inc., 422 F.2d 769 (7th Cir., 1970), reversed on other grounds, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Where the patent office should have caught the untruth, fraud will not be found, though a court as a court of equity may refuse to enforce a patent so obtained. See Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461 (D.Del. 1966), rev'd on other grounds 374 F.2d 473 (3rd Cir., 1967).

Fourth, it must appear that the holder of the patent either practiced the fraud complained of or attempted to enforce the patent monopoly with knowledge of the fraud. *Walker Process*, supra, 382 U.S. at 179, 86 S.Ct. 347 (concurring opinion of Justice Harlan).

Fifth, one of the essential elements of a violation of Section 2 of the Sherman Act must be shown, to wit, monopolization, attempts to monopolize, or combinations or conspiracies to monopolize. Apropos of this in the present case, the fact that plaintiff brought an infringement action is sufficient to show an attempt to monopolize. The burden of persuasion as to these elements is, of course, on the defendant.

■ As to the standard of proof entailed by that burden of persuasion, the law of patents is fairly clear that, as to the first three conditions, those relating to the establishment of an actual

fraud on the patent office, the burden of persuasion is proof by clear and convincing evidence, United States v. American Bell Telephone Co., 167 U.S. 224, 17 S. Ct. 809, 42 L.Ed. 144 (1897), and that a mere preponderance of the evidence may not be the basis for a finding of fraud. See generally, Ram, Patent Fraud: A New Defense, 54 Journal of the Patent Office Society 364 (1972) and cases cited therein at Footnote 64.

In the present case, the defendant's contention's reduce to the following:

(1) Knowing and wilful concealment of the non-joinder of an inventor.

(2) Knowing and wilful concealment of the misjoinder of inventors.

(4) Knowing and wilful mis-statements of "fact" by attorneys for plaintiff during the prosecution of the patent in suit before the patent office.

Defendant's first contention is based on a certain document in the files of plaintiff. To better understand this document, we must set the scene at the time of its genesis. The place is the Mueller Brass Co. Research & Development Department, the year 1960. The cast of principal characters is: Philip Perkins, Director of Research and Development; Vincent A. Bower, Manager of Wholesale Distributing who took a great interest in trying to find an improvement in Mueller's ACR tubing so that Mueller could capture a large share of the new ACR market; Robert A. Gray, Chief Product Engineer working under Perkins; Ed Roper, Head of Plastics Research, also under Perkins; and William Parker, John R. Fueslein and Robert Rader, lab technicians in the Research & Development Department.

■■■■■■ Perhaps a slight digression on the theory of joint inventorship would be helpful here. The exact parameters of what constitutes joint inventorship are quite difficult to define. It is one of the muddiest concepts in the muddy metaphysics of the patent law. On the one hand, it is reasonably clear that a person who has merely followed instructions of another in performing experiments is not a co-inventor of the object to which those experiments are directed. To claim inventorship is to claim at least some role in the final conception of that which is sought to be patented. Perhaps one need not be able to point to a specific component as one's sole idea, but one must be able to say that without his contribution to the final conception, it would have been less—less efficient, less simple, less economical, less something of benefit. This Court has found no case in which co-inventorship status was recognized where the alleged co-inventor was not deemed in some way, at least presumptively, to have beneficially affected the final concept of the claimed invention, and if such a case exists, it would be so anomalous as to warrant little attention.

■■■■■ When an infringer claims that someone is on a patent as inventor who shouldn't be, "this defense has always been regarded as technical, and is looked upon with disfavor by the courts (footnote omitted), and clear and convincing proof is required to sustain it." Deller's Walker on Patents, supra, § 42.

In this regard, we should note Thropp & Sons Co. v. Delaski & Thropp Woven Wire Co., 226 F. 941 (3rd Cir., 1915). In that case there was a joint patent to Delaski and Thropp for a machine of several mechanical components. Thropp conceived the machine and directed Delaski to design one component to do a certain thing. Delaski did this successfully, and Thropp put him on the patent. In the face of defendant's challenge of misjoinder, the Court held that Delaski's role was sufficient to qualify as a joint inventor since the patent was for a machine and he contributed to the final exact form of the machine.

It is worth observing here that non-joinder has often been treated more harshly than misjoinder, even when raised by a third party, because of the more suspicious nature of a failure to give credit initially to one entitled to credit. Even here, however, the courts

have been reluctant to strike down patents for non-joinder on challenges by third party infringers.

In this context, we find the doctrine of "mere suggestions" which denies co-inventorship status to a person who suggests some way to improve an invention casually but takes no further role in fitting the rough suggestion into the scheme of the invention workably. See *Forgie v. Oilwell Supply Co.*, 58 F. 871 (3rd Cir., 1893).

Further, we find the doctrine of employee improvement, which holds that an employee engaged in experiments to perfect another's concept does not become a co-inventor even if he suggests an improvement, unless the improvement is so significant as to amount to "a complete invention" in and of itself. See *Agawam Woolen Co. v. Jordan*, 74 (Wall) U.S. 583, 19 L.Ed. 177 (1869).

It is interesting to note that, had Thropp left Delaski off the patent in *Thropp Co.*, supra, the Court of Appeals would probably have upheld the patent by citing *Agawam,* and the result, although different on the issue of Delaski's status as co-inventor, would have nevertheless been just and equitable, in the context of a technical defense by a disinterested third party. This situation does make it difficult to say, however, with real certainty, whether or not a given person "is" a joint inventor in a given case. It is a question most often resolved as much on policy as on metaphysics.

Turning back now to the document in question, this document is composed of three parts, stapled one on top of the other. The top sheet (Def.Ex. 41) is a memorandum dated November 17, 1960 from Wm. Parker, a lab technician in the Mueller Brass Research & Development Division, to Robert Gray, Phil Perkins and F. B. Rote, (att'n Robert Gray), telling about certain experiments carried out by Parker.

The second part of the document (D–41A) is a set of handwritten notes relating to the tests covered in the typewritten memo of November 17. These are dated April 13, 1960.

The third part is a Shurclose$_{tm}$ plug catalogue marked D–41B.

Defendant claims this document establishes Parker as a co-inventor of the claimed method—the Court disagrees.

Viewed by itself, the document only indicates that Parker did some experiments in April of 1960 at the request of Vincent Bower and Robert A. Gray to see if commercially available Shurclose$_{tm}$ plugs would work "to hold pressure in tubing such as dry nitrogen at 5–10 psi." The writing does not indicate that Parker had anything to do with the idea, merely that he carried out the experiments. The writing does not even indicate in any strong manner that Bower or Gray conceived the underlying idea— they were merely the superiors who were the source of Parker's order. Shurclose$_{tm}$ plugs did not work, incidentally, and Parker appears to have had no more to do with the method of the patent in suit, except to write up his results formally (and somewhat tardily) on November 17, 1960. He did not evidence any proprietary interest in the concept behind his experiment, and observed on November 17 that "Ed Roper is working on the problem . . . ."

If D–41 does not establish Parker's inventorship on its face, it becomes even weaker viewed against the depositions of Parker, Gray, Perkins and Bower. Parker appears only to have been a lab technician who carried out a certain experiment under instructions of his superiors, recorded the results, and moved on to other things. He was not a co-inventor of the claimed method.

Perhaps it would have been wiser to have produced D–41 for patent office inspection (assuming there was actual knowledge of its existence during the prosecution of the patent application, which plaintiff denies). However, since the exhibit does not establish Parker as a co-inventor, nor does anything else, the Court can hardly find that failure so to produce it was wilful deception, or that

it was material. Defendant's counterclaim based on the alleged wilful concealment of the non-joinder of Parker must fail.

In actual fact, there is more circumstantial evidence that Gray or Perkins might have contributed to the conception of the method than that Parker did. However, Gray has repeatedly disclaimed any significant role and Perkins was responsible for designating the set of inventors actually found on the patent. In the face of this, it would be impossible on the record before the Court to find by clear and convincing evidence that Gray, Perkins, or any other person, was a non-joined co-inventor. All theories based on the alleged wilful concealment of the non-joinder of a co-inventor must therefore fail.

Now we turn to plaintiff's second theory, alleged fraudulent concealment of the misjoinder of inventors. There is no evidence to indicate that Ed Roper (now deceased) was not an inventor of the method claimed in the patent in suit (insofar as it was inventive at all, that is). The Court therefore must deem Ed Roper a proper inventor of the method claimed in the patent in suit.

 We now turn to John Fueslein. We know that whosoever idea it may have been, the seed idea of the method of the patent in suit was conceived by April 13, 1960, the date of the Parker experiments. Feuslein couldn't remember whether he was involved in the project at that time, and never heard of Parker's experiments. Feuslein's role was as assistant to Roper. During the summer and fall of 1960, he helped Roper in experiments. He appears to be a proper co-inventor of the plug (claimed in the parent application of the divisional which became the patent in suit) but could point to no particular role in the conception of the method. If the standard of proof here were not so high, the Court would have little trouble finding Feuslein not to be an inventor of the method. Yet Feuslein discussed the method generally with Roper and his name is on the patent. This court cannot find by clear and convincing evidence, that Feuslein contributed nothing to the exact conception of the method. It might be argued that his role was at most merely that of an employee assistant, but, as previously noted, this doctrine has only been used to save patents from attack for non-joinder, and never to defeat a patent for misjoinder. The Court must therefore deem Feuslein a properly named inventor for failure of clear proof to the contrary.

Not so Rader. Rader came to the project in the fall of 1960, at a point where the method claimed in the patent in suit was already fully conceived. His work upon the plug entitled him to co-inventorship status for the plug, but not the method. The method does not depend on a plug of Rader's design to operate even as applied to ACR tubing. The idea for every complete step *in the method* existed prior to Rader's involvement in the project. Although it would not yield an unjust result to do so, intellectual honesty prevents this court from stretching the concept of joint inventorship quite far enough to cover Rader.

 Rader is not a lawyer. He appears to believe sincerely that his design work on the plug makes him a co-inventor of the method. But the court finds that Robert Rader was not a co-inventor of the method claimed in the patent in suit and was misjoined.

Having found that Rader was misjoined as a co-inventor of the claimed method, the court must now determine whether plaintiff knew of the misjoinder, whether plaintiff, through its agents, wilfully concealed that misjoinder, and whether the concealment was material to the issuance of the patent in suit. In order to do this, it is necessary to outline certain facts leading up to the misjoinder. In the spring and summer of 1960, Roper and Feuslein, working together under Perkins, and in some contact with Gray and Bower, conceived the method and worked to reduce it to practice. They ran into some snags in the

design of a plug suitable to the application of the method to large diameter tubing and Rader was enlisted in the fall of 1960 to help design an appropriate plug. This he did. The next year was spent, off and on, working out problems of large scale commercial production of suitable plugs and tubing prepared according to the method. Apparently all that was originally considered patentable was the plug design, for on August 14, 1962, a patent application was filed in the names of Roper, Feuslein and Rader disclosing both method and plug, but claiming only the plug. The designation of proper inventors was done by Perkins as head of Mueller's Research & Development Division, and he was right, since as to the plug all three were co-inventors.

Plaintiff's first public sale of tube prepared by the method was January, 1963. Between then and December 1963, someone, identity unknown, decided that the application of August 14, 1962 disclosed a patentable method as well as the plug. On December 30, 1963, an amendment to the original application was filed to insert method claims.

On February 10, 1964, the patent office required restriction of the original application to either the article or the method. On August 14, 1964, a divisional application covering the method was filed in the names of all three inventors. On November 15, 1965, the method application was rejected on reference to the recently granted patent No. 3,115,010 to Collier, which disclosed but did not claim the method of the patent in suit. On February 14, 1966, Roper, Rader & Feuslein filed an affidavit under Patent Office Rule 131 swearing back of the reference, that is, claiming conception and reduction to practice before the filing date of the Collier patent, to wit, December 12, 1960.

The argument of defendant is that the misjoinder of Rader must have come to be known by plaintiff or its attorneys at some point in the above process, and that it was concealed to gain some bene-fit that plaintiff could not otherwise have gotten.

35 U.S.C. § 116, reads in pertinent part as follows:

"Whenever a person is joined in an application for patent as joint inventor through error, or a joint inventor is not included in an application through error, and such error arose without any deceptive intention on his part, the Commissioner may permit the application to be amended accordingly, under such terms as he prescribes."

37 C.F.R. 1.45(b), a patent office rule in force at all times relevant to this action, promulgated under 35 U.S.C. § 116, reads as follows:

"If an application for patent has been made through error and without any deceptive intention by two or more persons as joint inventors when they were not in fact joint inventors, the application may be amended to remove the names of those not inventors upon filing a statement of the facts verified by all of the original applicants, and an oath as required by § 1.65 by the applicant who is the actual inventor, provided the amendment is diligently made. Such amendment must have the written consent of any assignee."

35 U.S.C. § 120 reads as follows:

"An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application."

The leading case interpreting the exact meaning of 35 U.S.C. § 116 and 35

U.S.C. § 120, and their inter-relationship, is In re Schmidt, 130 U.S.P.Q. 404 (Ct.Cust. & Pat.Appeals, 1961) which was decided before any of the confusion in this case arose. *Schmidt* establishes the following principles: First, as to the proper meaning of the word "error" in § 116 as applied to attorney's errors of judgment, the Court said:

> In the third paragraph of section 116, the word "error" is not qualified except that it "arose without any deceptive intention" on the part of the applicant or applicants as the case may be. Since the error in the present case apparently occurred without any deceptive intention, we find no justification for denying appellant the remedial protection of section 116. (footnote omitted)

We had occasion to state in In re Willingham, 48 CCPA 727, 282 F.2d 353, 127 USPQ 211, 214, in regard to the reissue provision of the 1952 Patent Act:

> The reissue provisions of the Patent Act of 1952, like the reissue provisions of the earlier patent statutes are remedial in nature. They are based on fundamental principles of equity and fairness and should be so applied to the facts in any given case that justice will be done both to the patentee and to the public.

We think the same principles should be applied in interpreting and applying section 116. Our comments in the Willingham decision relative to the expressions "error" and "without any deceptive intention" are equally applicable to section 116. The same reason applies since both sections are remedial in nature and as such should be liberally construed in order that "errors" may be readily rectified.

We hold therefore, that the "error" which occurred in filing the joint application is of the type which the examiner under the provisions of the last paragraph of section 116 should have permitted appellant to correct by the filing of the instant sole application, which as a continuation-in-part application is entitled, under 35 U.S.C. 120, to the benefits of the filing date of the earlier application.

The practice approved in In re Roberts, 49 App.D.C. 250, 263 F. 646, and continued by this court in In re Perrin, 31 CCPA 1041, 142 F.2d 277, 61 USPQ 418, and In re Strain, 38 CCPA 933, 187 F.2d 737, 89 USPQ 156, in which conversion of an application from joint to sole or the filing of a sole application claiming the benefit of the filing date of a prior joint application was permitted only when the joint application had "been filed through mistake or inadvertence and without fraudulent intent" (In re Roberts, supra), or upon a showing that the joint application was made through "inadvertence or mistake" (In re Strain, supra), arose prior to the enactment of section 116, and when the applicable statute contained no provision comparable to the last paragraph thereof.

It is, we believe, the correct interpretation of congressional intent that the expression "error * * * without any deceptive intention" in section 116 was intended not only to replace the more cumbersome expression "inadvertence, accident or mistake" previously used but was intended to relieve applicants from the narrow application of the old terms as the courts had construed them. Every indicator of legislative intent points in that direction.

Thus, it is clear under *Schmidt* that the misjoinder of Rader, at the point of its discovery, is "error" within the meaning of both § 116 and Rule 45, even if it resulted from the mistake of counsel in interpreting the law, that is, in deeming Rader a proper inventor, if it initially came about "without deceptive intent." And there could hardly have been deceptive intent at the point of first mistake. If one takes the point of first mistake to be the filing of the original application on August 14,

1962, then obviously it must have been without deceptive intent, since there was nothing to be gained from not filing the original application to indicate the true inventorship of the method, had it then been known, or from not filing a separate application for the method at that time in the name of the proper inventors. And further, there could hardly have been deceptive intent present on December 30, 1963, the date of the filing of the method claims, as an amendment to the original application because, as will become clear momentarily, *Schmidt* would clearly have sanctioned the filing of a "continuing application" at that time in the names of the proper inventors [6], entitled to the original filing date. We must assume any error at either of these times to have been without deceptive intent, whether it sprang from a lack of specific information or from a misjudgment of counsel. For *Schmidt* goes on to discuss the meaning of the term "same inventor" in § 120 as follows:

> "The term 'the same inventor' as used in section 120 does not have the literal, narrow technical meaning the solicitor would have us assign to it. It must be construed with all other relevant sections of the statute, including sections 116 and 256 and thus it embraces the possibility permitted by sections 116 and 256 that the earlier application may be corrected thereunder by changes in the name or names of the applicants under the conditions stated in section 116.

We hold, therefore, that appellant was entitled under section 116 to correct the errors in the intermediate application filed in the names of joint inventors and under section 120 was entitled as 'the same inventor' to the benefits of the filing dates of the earlier co-pending applications. This hold-

ing removes the Belgian patents as references and we, therefore, reverse the Board of Appeals in rejecting the instant application on that ground."

Now it is true that *Schmidt* speaks of the right to correct the earlier application by amendment. This appears formally difficult to do in a situation where the original application, as initially filed, discloses two inventions, claiming only one, and the "continuing application" is for the unclaimed subject matter. Yet *Schmidt* sanctioned a correction process whereby six claimed co-inventors in the original application merely each disclaimed that which was not his. This is no more technically "amendment" to the earlier application in *Schmidt* than a similar disclaimer to subject matter disclosed but not claimed in the original application of the present case would be, and further, it would be fairly simple for a good draftsman to amend the specification of the first application to incorporate the disclaimers for the method claims.

Thus it appears clear that on December 30, 1963, had the true state of facts been known, the error could have been corrected and the original filing date retained. Moreover, even after the amendment the original application on December 30, 1963, and the requirement for restriction, the plaintiffs could quite properly, had they known to, elected to restrict the original to the method claims and then converted the inventorship on that restriction by striking Rader without losing the original filing date. Further, if the misjoinder had been discovered at any time between the erroneous amendment of the original claims on December 30, 1963, and the filing of the divisional application on August 14, 1964, the divisional application could have been filed and properly denominated a divisional application entitled to the original

---

6. A "continuing application" under 35 U. S.C. § 120 is different than a "continuation," under 35 U.S.C. § 121. A continuation may be filed only for the invention originally "claimed." A "continuing application" is generally for matter disclosed but not claimed although it is not limited to that. See Sections 201.07 and 201.11 of the Manual of Patent Examining Practice (MPEP) a publication which, though only semi-official, is the best indicator of Patent Office policy.

filing date even though Rader was struck under Rule 45 at that time, given the interpretation of *Schmidt* by the Patent Office itself in the Manual of Patent Examining Practice (MPEP). Section 201.06 of the MPEP points out that

"[S]ince Rule 45(b) permits the conversion of a joint application to a sole, it follows that a new application restricted to divisible subject matter, filed during the pendency of the joint application by one of the joint applicants, in place of restricting and converting the joint case, may properly be identified as a division of a joint application."

(The same rules apply for movement from joint to less joint as apply to movement from joint to sole, of course)

Besides these alternatives, the route of a newly filed "continuing application" under § 120 as explained by MPEP § 201.11 was open at all times, at least until the issuance of the patent on the parent application on August 17, 1965. Thus we may assume that the misjoinder was not realized at least until then.

■ A year before the patent issued on the parent application, plaintiff's assignors had filed their completed divisional application. It was "an application entitled to the benefit of the filing date of the first application" under § 120. It will be noted that In re Schmidt specifically states that section 120 must be construed as embracing "the possibility permitted by sections 116 *and 256* that the earlier applications may be corrected thereunder . . . ." (emphasis supplied) The clear implication of this, is that Section 120 may be used to get the filing date of a parent even after the patent on the parent has issued as long as there is a continuous chain of valid outstanding applications, the continuing application at the end of the chain is corrected by removing misjoined inventors and all the links in the chain which need to be corrected are properly corrected under either § 116 or § 256.

But, defendant might argue, § 256 only authorizes striking a name from the patent as issued. If Rader had been misjoined on the plug this avenue would be open, but vis a vis the plug patent as issued in this case, no names may be struck because all three were proper inventors of the plug. This is true, but the parent application need not in this case have been corrected after the issue of the patent under § 256 because it had already been corrected by the requirement of restriction, the election to restrict the original application to the plug alone, and the filing of the divisional application. The only thing which was in error after restriction which would need to be corrected was the pending divisional application.

Thus it would have been perfectly feasible to have filed a new "continuing application" when the misjoinder was discovered even after the patent issued on the parent. The new continuing application would then have been "an application for an invention" disclosed by the "same inventor" (by the teaching of *Schmidt*) in a co-pending "application entitled to the benefit of the filing date" (the misjoined divisional) of the "first application" (the parent) and would have been likewise entitled to the filing date of the parent. See MPEP § 201.11.

It would seem more economical simply to allow the divisional to be corrected directly under Rule 45(b) of the Patent Office and retain the original filing date. But whether done by direct correction under 45(b) or by newly filed continuing application, it is crystal clear that plaintiffs could have struck Rader (with his cooperation, which would almost certainly have been forthcoming had the situation and his proper status been explained) and still retained the benefit of the August 14, 1962 filing date at any time up to the issuance of the patent in suit.

Thus, there was no time when their own prior public sale of January, 1963, would have acted as a statutory bar to their obtaining the patent in suit even if

they had corrected the misjoinder by striking Rader.

Having thus negatived any motive for fraud, the court cannot find any wilful fraudulent act shown by clear and convincing proof. There is not any real evidence that any of the persons named as inventors, any of their attorneys, or any agent of plaintiffs ever was aware that the facts known to them should have dictated the conclusion that Rader was not properly joined.

There is not any real evidence that plaintiff's attorney did not, on all the facts, simply make a good faith error in judgment in concluding that Rader was properly joined. This is understandable in light of the existence of language in such cases as *Thropp Co.,* supra, as previously explained.

■■■ And even if plaintiffs knew of the misjoinder, and thought they were defrauding the patent office because they hadn't read the law, their act would lack the materiality necessary to sustain the counterclaim. Their act would not in that case result in getting something their clients were not entitled to—indeed, they would have risked, inadvertently, throwing away anything their clients had a claim to, because their failure to reveal, had it come to light by good proof (which is always a risk), would have rendered the patent misjoined and uncorrectable, and therefore unenforceable since correction either under § 116 or § 256 would not have been possible since it was not undertaken with due diligence as required by both those sections.

Sections 116 and 256 evidence realization on the part of Congress that because of the haziness of the boundaries of co-inventorship status and the realities of work in large research labs, misjoinder is bound to be common and should be easily correctable at any time with no loss of benefit under the law. This is qualified to some extent by the continuing vitality of the older decisions noted above denying relation back of filing dates where persons are sought to be added who should have been named originally.

The present value of this attitude is to be doubted, however, especially in the context of corporate research and development where one entity is the assignee of all possible inventors. The cases where it protects against some unwarranted actions are far outnumbered by those where it destroys, rather capriciously, an otherwise valid right, tempts people to fraud, and stimulates endless attempts to prove its presence with voluminous circumstantial evidence by third parties (who are defendants in infringement suits) with little real interest in the identity of the precise set of the exact real and true inventors.

■■■ Whatever the status of the so called "sole to joint" rule may be, however, the law has always generally recognized the basic right to relate back to a parent filing date when removing inventors who cooperate in disclaiming. See In re Roberts and In re Perrin, cited in the quoted portions of In re Schmidt, supra. In re Schmidt simply affirms the basic rule that one should be able and is able to remove inventors misjoined without deceptive intent at any stage without losing any benefit, including the benefit of the filing date of the earliest subject matter disclosure, as long as all the real inventors were then present, no matter how many extra misjoined non-inventors there may then have been. Defendant's counterclaim based on fraudulent concealment of misjoinder is denied.

■■■ Defendant's third ground for its anti-trust counterclaim is based upon alleged mis-statements of plaintiff's counsel to the Patent Office during the prosecution of the patent application. Two conflicting principles tear at an attorney practicing before the patent office. One is that the proceeding is not adversary, so the attorney therefore owes a high duty of candor to the examiner. The second is that the attorney has a duty of advocacy to his client. One should not forget in this context that the examiner himself is or should be an advocate for the public interest and

should not be too easily swayed by the applicant's attorney.

■ On April 1, 1965, the examiner rejected the patent in suit as to all claims on reference to Patent 2,714,447 to *Gardes,* which revealed a method of sealing nitrogen in tubing using a flying shear. Attorney for plaintiff wrote back to the examiner saying, among other things that "the rejection should be withdrawn, at least as to claims 3 and 4, because as to those claims, the seal thus formed wouldn't hold the pressure." The examiner reinstated all four claims. Acceptance of the complained-of argument would have led only to reinstatement of claims 3 and 4. However, any argument which led to the reinstatement of claims 1 and 2 would also have led to the reinstatement of claims 3 and 4. Thus, the reinstatement of all four claims undermines any conclusion that the complained-of language was material to the action of the examiner, since the reinstatement of claims 1 and 2 could only have been on grounds leading to the reinstatement of claims 3 and 4 independent of the complained-of language. More importantly, this language appears to be no more than mere advocacy. Plaintiff's attorney didn't say he based his allegation on any experiment, document or other authority; he *might have safer* said "I don't think it will work" or "It's obvious that it won't work." Yet it is fairly apparent that it is an argument put forth for the evaluation of the expert examiner, not a fraudulent statement of fact. Further, it is probably closer to being accurate than inaccurate. Although an occasional flying shear seal might be pressure tight, there does not appear to be any way to make them predictably pressure tight. There is no fraud here.

■ The second alleged fraudulent mis-statement complained of is the attorney's argument in support of the affidavit under Rule 131 that the exhibits submitted with the affidavit support a reduction to practice before December 12, 1960. The exhibits were there for the examiner's independent scrutiny.

They spoke for themselves, and if plaintiff's attorney puffed up their significance in his own argument, the Court still does not see that this rises to the level of a fraudulent mis-statement of material fact.

Further, the record, extensive as it is, fails to establish that there was not a complete reduction to practice by December 12, 1960, and even if there was not, there was certainly conception and diligent work toward reduction to practice. This is a valid alternative ground for an affidavit under Rule 131. It was not claimed, but its existence negates an inference of fraud in the affidavit as filed.

Defendant's other allegations of fraud are groundless. Defendant's counterclaim under Section 2 of the Sherman Act is therefore denied.

## DEFENDANT'S MOTION FOR AN AWARD OF ATTORNEYS' FEES UNDER 35 U.S.C. § 285

The final question is whether the Court should regard the present case as an "exceptional case" under 35 U.S.C. § 285, which provides:

> "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

■ Generally, the decision to award attorneys' fees is based on a finding of some misconduct by the losing party. This misconduct may be misconduct in securing the patent, or misconduct in conducting the litigation after the patent has been secured. Penn. Crusher Co. v. Bethlehem Steel Co., 193 F.2d 445 (3rd Cir., 1951). Misconduct before the Patent Office need not be fraudulent, but only grossly negligent so as to evidence a disregard for the truth. Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288 (9th Cir., 1969).

As a basis for a finding of misconduct, the defendant again offers the affidavits of the misjoined inventor before the patent office, and the statement of counsel before the patent office discussed above.

The affidavits do not clearly appear to have been other than good faith errors, as discussed above. Rader certainly thought he was an inventor, and there is little evidence to indicate that his attorney did not think him properly joined.

The arguments of counsel to the patent office in this case do not evidence a "reckless disregard for the truth" in the opinion of this Court, even if they were slightly puffed.

As another basis for finding misconduct, defendant avers that, even if plaintiff did not know at the time of the filing of the Rule 131 affidavit in 1966 that Rader was misjoined, plaintiff should have known, because plaintiff's duty to the Patent Office was to make a thorough investigation of the facts at that time. If the facts establishing Rader's misjoinder did not come to light, it was because the investigation wasn't proper, and this is a violation of plaintiff's duty to the Patent Office and shows gross negligence. In support of this position, plaintiff cites the very recent case of Becton, Dickinson & Co. v. Sherwood Medical Industries, Inc., 175 U.S.P.Q. 337 (M.D.Fla., 1972). The Court finds this decision out of point for two reasons.

First, it was clear in *Becton* that plaintiff had either not discovered the prior use or had concealed it, since the legal effect of the prior use was clear. In the present case, it is possible that an attorney could have discovered the facts surrounding Rader's involvement with the invention here and still in good faith have mistakenly concluded that Rader was a proper co-inventor, considering the unclearness of the law of co-inventorship status in close cases as discussed above. This would not have been an impropriety, and defendant never attempted to negative this possibility by calling the attorney in question to testify though he was present throughout the trial.

Second, the plaintiff in *Becton* benefitted from his failure to investigate. The plaintiff here did not. Even if there was a failure to investigate and therefore a breach of plaintiff's duty to the Patent

Office here, there is no particular reason to award attorneys' fees.

 The basic rationale behind Section 285 is compensatory not punitive. The major purpose of the Section is to compensate a prevailing party for monies which he had to spend which he would not have had to spend but for the losing party's misconduct. If the prevailing party would have had to spend approximately the same amount litigating the patent even if none of the alleged misconduct had taken place, it appears to this Court that an award of attorneys' fees would be punitive and not compensatory. Although such an award might have a salutary disciplining effect, this Court feels that absent any compensatory justification, the disciplining of patent attorneys is better pursued through other available channels and not by an award of attorneys' fees.

The defendant has cited Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288, 294 (9th Cir., 1969), in support of the proposition that it is proper to award attorneys' fees as a disciplinary measure. But even this case speaks of awarding attorneys' fees against "the patentee *who obtained* the patent by his wrong doing." Id. at 294 (emphasis supplied). Even if there was any gross negligence or improper motivation behind any of the things which occurred before the Patent Office (and we do not so find), the Court finds that it would have been immaterial in the sense that had there been proper investigation, discovery of misjoinder and correction, plaintiff would still have had to defend the present suit. The Court sees no reason to award attorneys' fees on this ground.

The final contention of defendant is that there was wilful misrepresentation in an affidavit of patentee Feuslein filed in support of an opposition to defendant's motion that plaintiff be required to post a bond to cover possible costs and attorneys' fees. While not necessarily condoning the actions of plaintiff's attorney, the intimate details of the meeting at which this affidavit was drawn up

are too unclear and the exact nature of the interchange between Feuslein and the attorney too crucial to allow a finding of actual fraud. Further, this too, would not be material to forcing defendant to spend money in defense of a claim that he otherwise would not have to defend. The Court declines to award attorneys' fees on this ground.

The fact that this Court has not found fraud chargeable to plaintiff, or awarded attorneys' fees, should not be taken as placing this Court's imprimatur on all of plaintiff's actions. It results more from failure of proof in otherwise suggestive circumstances, or the possibly fortuitous absence of materiality. Hopefully, the plaintiff and its attorneys will be more careful in the future in insuring that the circumstances surrounding their actions are not at all even suggestive of impropriety.

It only remains to point out that this Opinion is promulgated in discharge of this Court's obligations under Federal Rules of Civil Procedure 52(a) and constitutes this Court's Findings of Fact and Conclusions of Law.