**JAMESBURY CORPORATION**

v.

**The UNITED STATES.**

**Nos. 189–63, 520–71.**

United States Court of Claims.

July 11, 1975.

Robert F. Conrad, Robert C. Miller, Arlington, Va., Atty. of record, for plaintiff.

Thomas J. Byrnes, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, for defendant.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, and BENNETT, Judge.

## OPINION

PER CURIAM:

These consolidated cases come before the court on defendant's exceptions to the opinion and recommended decision, filed May 16, 1967 [pursuant to then Rule 57(a)], by then Commissioner Donald E. Lane (now Judge of the United States Court of Customs and Patent Appeals) and to the supplemental opinion and recommended decision, filed September 20, 1974 [pursuant to Rule 134(h)], by Trial Judge Joseph V. Colaianni. The court has considered the cases on the briefs and oral argument of counsel. Since the court agrees with the opinions, findings of fact and recommended decisions filed May 16, 1967, and September 20, 1974, as hereinafter set

forth, it hereby affirms and adopts them as the basis for its judgment in these cases. Therefore, the court concludes as a matter of law that claims 7 and 8 of United States Letters Patent No. 2,945,666 are valid and have been infringed by the defendant's unauthorized use of ball valves produced by the Electric Boat Division of General Dynamics Corp. and by Worcester Valve Co., Inc., and that plaintiff is entitled to recover reasonable and entire compensation therefor. Accordingly, judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c)(2).

## OPINIONS OF TRIAL JUDGES

### LANE, Commissioner:

This is a patent suit under Title 28 U.S.C. § 1498 to recover reasonable and entire compensation for the unauthorized use or manufacture by or for the defendant of a patented invention. Plaintiff specifically alleges that ball valves manufactured by Electric Boat Division, General Dynamics Corp. and by Worcester Valve Co., Inc., and procured and used by the defendant embody an invention defined in varying scope in patent claims 7 and 8 of U.S. Letters Patent No. 2,945,666, entitled "Ball Valve." Said patent, referred to hereafter as the patent in suit, issued to plaintiff on July 19, 1960, on an application for patent filed February 14, 1958, which was a continuation in part of a parent application filed June 11, 1954. After the trial on liability was completed with briefs and requested findings being submitted, plaintiff's ownership of the patent in suit was put in issue by E. W. Bliss Co. in the United States District Court for the District of Massachusetts. In view of the suit in Massachusetts, the parties have stipulated to stay action on the present suit, after commissioner's report has been filed, until the ownership issue has been settled in the Massachusetts District Court. Plaintiff has agreed to dismiss the present suit if the District Court finds against plaintiff on the issue of ownership. The parties have also agreed to defer trial of any accounting issues until the issues of patent infringement and patent validity are decided.

It is concluded that claims 7 and 8 of the patent in suit are valid and that ball valves manufactured by both the Electric Boat Division, General Dynamics Corp., and by Worcester Valve Co. which were procured and used by the defendant infringe said patent claims.

The patent in suit describes and claims an improved ball valve. A ball valve is used to control the flow of liquids and gases in pipelines and includes a casing adapted to be connected to a pipeline and having a valve chamber with both an inlet and an outlet opening. A ball having a passage extending through it is mounted for rotation in the valve chamber. In one position of rotation, the passage in the ball is alined with the inlet and outlet openings to permit fluid flow through the ball valve and in another position of rotation, the passage is positioned at right angles to the inlet and outlet openings in the valve casing to prevent the flow of fluid.

Prior to the development of the plaintiff's patented valve, ball valves were not generally accepted or used by industry. In early ball valves, the ball with a passage extending therethrough was tightly journaled into the valve chamber. Temperature variations, pressure variations, and/or valve wear, either caused the valve to leak or made it extremely difficult to operate by rotating the ball between open and closed position. Attempts to solve this problem were made by journaling the ball against some material, preferably nonmetallic, in what were known as compression sealing rings placed about the outlet opening and about the inlet opening. The ball was truncated on each side where the passage ends and reduced ball pressure resulted when the ball was placed so that the passage lines up with the openings in the casing in the open valve position. When the ball was rotated to a closed position, the nontruncated portion of the ball pressed into the material of the sealing rings with sufficient force to provide a fluid tight seal. These compression

sealing rings made no provision for expansion or contraction of the ball or casing and for valve wear. Compression sealing rings did compensate somewhat for the problems of leakability and ease of ball rotation but not adequately for use in modern industry.

The ball valve which is the subject matter of the patent in suit solved the problems of temperature variation, pressure variation, and valve wear. The patented ball valve employs a novel sealing ring utilizing a principle different from the compression sealing rings which seal by the nontruncated portion of the ball pressing into the material of the sealing rings. The sealing ring of the patent in suit has a portion which flexes with respect to the remainder of the sealing ring and which is known as a lip. This lip projects inward with a graduated stiffness due to its increasing cross sectional shape in the radial direction. The lip is prestressed which causes it to flex into sealing contact or engagement with the ball even when the ball is being rotated. For a more detailed explanation of the patent in suit see finding 10.

After the patented valve was described in several trade journals, over 1,000 inquiries were received which later became purchase orders for the valve. This flow of inquiries and orders grew so fast that plaintiff could not keep up with production orders. Plaintiff grew from a corporation having 3 or 4 employees at the time of the announcement in 1954 to over 550 employees at the time of trial in January 1966. Over 3 million ball valves valued at over $50 million were sold since the announcement in 1954.

In the summer or fall of 1957, an engineer from the Portsmouth Navy Yard approached plaintiff about the possible use of the plaintiff's valve on Navy submarines. Increased size and better hull construction enable the modern submarine to navigate at greater depths. Valves must operate under greatly increased pressure, be able to withstand hydraulic shock caused by depth charges permit fluids to flow silently, work un-

der problems of corrosion and erosion with sea water, and be remotely operable. No other valve in industry or in prior submarine service except the plaintiff's valves solved all of these problems.

At the request of the Portsmouth Navy Yard, plaintiff's engineers lectured on the theory and function of ball valves to the engineers of the Electric Boat Division, General Dynamics Corp. which was building nuclear submarines but had no ball valves or even contemplated using them. In April 1958, Electric Boat informed plaintiff that they were going to make their own ball valves and no longer needed plaintiff.

Nylon and teflon were available well before plaintiff's ball valve was developed, and defendant's contention that the commercial success of the patented valve resulted from the availability of nylon and teflon is without merit.

Defendant has interposed the usual defenses of the invalidity and/or noninfringement of claims 7 and 8 of the patent in suit. In interposing these defenses defendant's major contention is that because of the prosecution history of claims 7 and 8 of the patent in suit, the clear language of these claims must be limited. More specifically, defendant argues that although claims 7 and 8 call for a sealing ring and the claim language does not limit whether that sealing ring is placed on the upstream side or on the dowstream side of the valve chamber, the prosecution history forces the claims to be interpreted as being limited to a sealing ring on the upstream side of the valve chamber.

Patent claims 7 and 8, set forth in finding 11, define a ball valve comprising a casing, valve chamber having openings, a rotatable ball in the chamber and having a port, and a sealing ring mounted in the chamber around one of the openings, the sealing ring having a lip extending toward the axis of the ring and engaging the ball. Claims 7 and 8 define the lip as free to bend in the axial direction and increasing in thickness outward in the radial direction of the ring, which projects inwardly toward the axis

of the sealing ring and sealingly contacts or engages the ball, and which is free to move in the axial direction of the sealing ring. Claim 8 further defines the lip as having one side face disposed toward the ball and one side face away from the ball, which faces diverge from each other substantially uniformly outward in the radial direction of the ring.

The prosecution history of claims 7 and 8 of the patent in suit is discussed in detail in finding 13. Plaintiff urged that claims 7 and 8 distinguished over Saunders' French patent 1,018,974 because the lip on the sealing ring disclosed in Saunders would not seal on the upstream side. It was the patentees' position during the prosecution of the application for patent that if the lip didn't increase in thickness outward in the radial direction as defined in claims 7 and 8 but was uniform in thickness as disclosed in Saunders, the lip would bend at an intermediate point to such an extent that the lip would curl away from the ball and cause a leak on the upstream side. The Patent Office examiner allowed claims on the basis of this argument. The clear language of patent claims 7 and 8 covers either a downstream or an upstream seal. The patentees were not required to argue the advantages of a sealing ring on the downstream side since the lip shown in Saunders would not seal on the downstream side of the valve. The clear language of patent claims 7 and 8 is not limited by the prosecution history to an upstream seal but also covers a downstream seal.

In *O'Brien v. O'Brien*, 202 F.2d 254 (7th Cir. 1953), the patentee in the prosecution history of the patent there in suit argued that one of the advantages of his invention was that a conventional motor could be used. The allowed claims were not limited to a conventional motor but recited "a motor." The accused construction there was identical to that of plaintiff's device but used an *unconventional* motor. In holding that the prosecution history did not limit the claims to a conventional motor, the court stated:

It is hardly reasonable to think that the patent would have issued over the prior art merely on this particular feature without including it in the claims which, after all, measure the grant. 202 F.2d at 257.

In support of its contention that claims 7 and 8 are unpatentable in view of the prior art available at the time the invention was made, the defendant directs attention to several prior patents set forth in the findings. Each of these prior patents discloses a valve having a casing, a valve chamber, and a ball with a passage extending through it which rotates between an open position with the passage alined with the inlet and outlet openings of the valve casing and a closed position where the passage is out of alinement with the openings. Defendant relies particularly on Blevans' patent 2,516,947, Australian patent 126,-685, and British patent 692,085. Blevans shows a valve having a mechanism for axially moving the core out of engagement with a sealing ring before the core is rotated. The lips of the sealing ring disclosed in Blevans are not always in sealing engagement with the core when the core is rotated from an open position to a closed position or vice versa. Austrian patent 126,685 discloses a ball and stem made of one piece which cannot move axially. The sealing rings of flexible material such as rubber may be chamfered where the ball bears against them. Since flexible sealing rings of the Australian patent are firmly against the ball and the ball cannot move axially under fluid pressure, there is no lip free to bend in the axial direction of the sealing ring as defined in claims 7 and 8 in suit. The sealing rings of the Australian patent are in sealing engagement with the ball when fluid pressure acts upon the backs of the sealing rings. Claims 7 and 8 define a sealing ring having a lip which is always in sealing contact with the ball. Defendant has placed particular emphasis on Saunders British patent 692,085. Saunders French patent 1,018,-947 (the equivalent of the British Saun-

ders argued here) was considered by the Patent Office when allowing patent claims 7 and 8 here in suit and there is a presumption that these claims are patentable over the Saunders valves. Saunders discloses rubber sealing rings which utilize a compression seal wherein portions of the ball mash the sealing rings. In addition to the compression seal, Saunders discloses a lip on the rubber sealing ring which contacts the ball when fluid pressure forces it against the ball. Saunders' lip does not increase in thickness outward in the radial direction of the sealing ring as required by claim 7 nor does the lip have side faces disposed toward and away from the ball which diverge from each other substantially uniformly outward in the radial direction of the ring as required by claim 8 in suit. Saunders lip is straight edged and of uniform thickness. Plaintiff successfully argued in the prosecution history that a straight-edged lip, like the Saunders lip, would bend at an intermediate point and curl away from the ball to cause a leak. Claims define a lip increasing in thickness outward in the radial direction of the ring patentably distinguished over the Saunders constructions. Defendant's contention that this argument was erroneous is without merit. None of the several cited prior art patents either singly or collectively disclose a ball valve having a sealing ring with the structural and functional features of the ball valve defined in claims 7 and 8 in suit.

■ Defendant urges that under 35 U.S.C. § 103 it would have been obvious to one skilled in the art to provide the straight-sided sealing rings of Saunders with a tapered lip as shown in Antonelli patent 2,348,587. There is no suggestion in Antonelli that the rubber dual wiping lips there disclosed could be used in a ball valve of the Saunders construction. The Antonelli dual wiping lips are not free to bend axially in the direction of the sealing ring but are compressed downward and would not seal or stay on the valve ball if substituted in the Saunders construction. The Antonelli lips are tapered but to prevent the exterior faces of the lips from being extruded and pinched between the flanges of the sealing ring retaining shell and not to progressively increase the sealing force between the dual lips and the ball. Even if the tapered lip disclosed in Antonelli could be substituted in Saunders, the lip in Saunders is not always in engagement with the ball as required by the claims at issue. Claims 7 and 8 are valid over any attempted combination of Saunders with Antonelli.

■ In addition, defendant urges that claims 7 and 8 are invalid as indefinite under 35 U.S.C. § 112 because the terms "lip," "axis," "axial," and "radial" are nowhere defined in the specification. This contention is without merit. Claims 7 and 8 are clear and definite to one skilled in the ball valve art when read in light of the specification and drawings. These claims can be easily read on the illustrative drawings and are valid.

Now turning to the issue of infringement, plaintiff alleges that certain ball valves manufactured by Electric Boat Division, General Dynamics Corp. (hereinafter called the Electric Boat ball valve) and that certain ball valves manufactured by the Worcester Valve Co. (hereinafter called the Worcester ball valve), which were procured and used by the defendant, infringe claims 7 and 8 of the patent in suit.

■■ An accused device may infringe the claims of a patent if the patent claim reads element for element on the device. Even where the patent claim does not read element for element, if the accused structure performs substantially the same way to obtain the same result, infringement may exist under the doctrine of equivalents. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). In *Graver Tank*, the Supreme Court indicated that an important factor in determining whether different structures are equivalent is whether "persons reasonably skilled in the art would have known of the interchangeability" of the structures.

Both the Worcester ball valve and the Electric Boat ball valve include a conventional casing, valve chamber, and a ball with a passage extending through it which rotates between an open position with the passage alined with the inlet and outlet openings of the valve casing and a closed position where the passage is out of alinement with the openings, which ball cooperates with a sealing ring mounted around one of the openings. Infringement rests on whether the Electric Boat sealing ring and/or the Worcester sealing ring are within the scope of claims 7 and 8 of the patent in suit.

The Electric Boat sealing ring has an outer body portion and an inner portion which is of reduced cross sectional area and which projects inwardly toward the axis of the ring and contacts the ball. This inner portion is shaped in the form of a projecting edge or lip which increases in thickness outward in the radial direction of the ring as required by patent claim 7. Although the portion of the Electric Boat sealing ring designated as the lip has surfaces of differing inclinations, the faces of the lip, one disposed toward the ball and the other away from the ball, diverge substantially uniformly outward in the radial direction as required by patent claim 8. The issue is whether the lip is free to bend in the axial direction of the sealing ring. Defendant argues that the Electric Boat sealing ring does not function substantially the same way to obtain the same result but instead torsionally twists by the ball pressing on the lip to rotate the entire sealing ring about a circular line representing the locus of points which are the centroids of the cross sections of the sealing ring. It is obvious, however, that the inner portion of the Electric Boat sealing ring is of reduced cross section due to its tapered cross sectional shape and that there will also be lip bending sealing in the Electric Boat ball valve. Tests conducted on the Electric Boat sealing ring demonstrated that there were *both* substantial torsional twisting and substantial lip bending.

The torsional twisting is additive in nature and is not exclusive of the lip bending defined in patent claims 7 and 8. The Electric Boat ball valve responds to claims 7 and 8 of the patent in suit and performs substantially the same function to obtain substantially the same result. The accused Electric Boat ball valve infringes patent claims 7 and 8.

With regard to the accused Worcester ball valve sealing ring, the major issue is whether this sealing ring has the lip configuration defined by claims 7 and 8. The Worcester sealing ring has an inner axial surface which is a spherical portion having a radius greater than that of the ball. The inner radial portion of the sealing ring is reduced in cross sectional area and tapers outward in the radial direction due to the spherical axial inner surface, a flat cylindrical axial outer surface, and the parallel flat front and rear faces. When the sealing rings are mounted in the valve chamber about each of the inlet and outlet openings, the distance between the rings is less than the diameter of the ball so that the ball preloads the inner radial tapered portion of the sealing ring by contacting approximately 50 percent of the axial inner spherical portion. As the ball is moved by fluid pressure downstream, the ball bends a portion of the tapered portion and compresses a portion of the sealing ring so that the area of contact increases from 50 percent up to 100 percent of the inner spherical surface as the pressure increases. The Worcester ball valve sealing ring combines lip bending with a progressive compression sealing between the ball and the seat. This progressive compression sealing is additive in nature and not exclusive of the lip-bending concept defined in claims 7 and 8 of the patent in suit. The tapered portion of the Worcester ball valve sealing ring functions in substantially the same way to produce substantially the same result as the lip defined in claims 7 and 8. The Worcester ball valve infringes patent claims 7 and 8.

Both of the accused ball valves include sealing rings in which grooves are pro-

vided in their outer peripheral edges to permit fluid to escape through the sealing ring on the upstream side of the valve. Defendant argues that the accused ball valves do not infringe claims 7 and 8 of the patent in suit because the prosecution history limits the claims to a ball valve having lip sealing on the upstream side. The prosecution history does not so limit the clear intent of claims 7 and 8 to define either an upstream sealing ring or a downstream sealing ring.

COLAIANNI, Trial Judge:

On May 16, 1967, Commissioner Donald E. Lane[1] rendered an opinion,[2] proposed findings of fact, and a recommended conclusion of law in which he concluded that claims 7 and 8 of plaintiff's United States Letters Patent No. 2,945,666 (hereinafter referred to as the '666 patent) were valid and infringed by defendant's unauthorized use of ball valves manufactured by the Electric Boat Division of General Dynamics Corp. and Worcester Valve Co., Inc.[3] However, prior to final action, plaintiff's ownership of the patent in suit was put in issue by E. W. Bliss Co., an intervenor in an infringement action in the United States District Court for the District of Massachusetts between Jamesbury Corp. as plaintiff and Worcester Valve Co., Inc., as defendant. In view of the Massachusetts suit, the parties agreed to a stay of proceedings in the present suit, after the commissioner's report had been filed, until ownership of the patent in suit had been settled in the Massachusetts court.

On June 29, 1971, plaintiff reported to this court that following a full trial on the issue of ownership, the United States District Court for the District of Massachusetts entered judgment for Jamesbury Corp., 318 F.Supp. 1 (1970). Plain-

tiff further reported that the District Court's judgment had been affirmed by the United States Court of Appeals for the First Circuit, 443 F.2d 205 (1971). At the same time, plaintiff moved to remand the case to the trial division of this court for further proceedings and additional findings of fact concerning an issue raised by E. W. Bliss Co. and commented upon, without deciding, by the Massachusetts District Court, to wit, whether the named inventors of the patent in suit, Howard G. Freeman and Oscar R. Vaudreuil, were joined in a manner irremediably contrary to applicable law. Thus, at 318 F.Supp. 6, in fn. 6, the District Court in Massachusetts stated:

If relevant, the court would find that Vaudreuil was added to the application as a spurious joint inventor to shield Jamesbury against any claim by Rockwood that its president and principal shareholder had conceived the invention while a Rockwood employee.

On appeal, the First Circuit noted this finding and Jamesbury's strenuous objection that it was erroneous. The decision of the First Circuit indicated that the finding was clearly *dictum* and not binding in other litigation, but because it felt that there was evidence to support it, the court concluded that the finding could not be said to be clearly erroneous.

In addition, plaintiff moved to remand this case back to this court's trial division so that additional findings of fact could be made concerning a patent called to plaintiff's attention by Worcester Valve Co., defendant in the Massachusetts action, during the settlement discussions between the parties. The patent, Melichar, *et al.*, United States Patent No. 2,409,220 (hereinafter referred to as the '200 patent) was, according to plaintiff's remand motion, alleged by Worcester Valve Co. to constitute a reference highly pertinent to the validity of

---

1. Now Judge of the United States Court of Customs and Patent Appeals.

2. 153 USPQ 672 (Trial Div., Ct.Cl.1967).

3. This opinion is supplemental to that of May 16, 1967, and a thorough understanding of the facts requires a careful review of former Commissioner Lane's prior opinion. Moreover, because of this relationship, the findings of fact in this report begin with No. 26 and depend upon the findings in the earlier report.

the patent in suit. Although defendant opposed plaintiff's motion to remand, this court, in an order dated October 1, 1971, remanded this suit to allow defendant to raise in supplemental pleadings the issues of misjoinder of inventors and the effect of Melichar, et al., on the validity of the claims in suit.[4]

In accordance with said order, an additional trial was conducted. The issues at trial were limited to whether:

(1) there was a misjoinder of inventors in the patent in suit because Freeman was the sole inventor of all subject matter contained and claimed therein;

(2) Vaudreuil was added as a coinventor without error and with deceptive intent in order to deceive Rockwood, Freeman's former employer, into believing that the invention claimed in the patent was developed when Freeman started working with Vaudreuil, after he left Rockwood's employ, and

(3) the prior art patents of Melichar, et al., and Cross British Specification No. 373,660 render the claims in suit unpatentable.

As a result of a careful and complete evaluation of each of defendant's contentions, and for reasons which will be explained in considerable detail hereinbelow, it is concluded that claims 7 and 8 of the '666 patent are valid and infringed by defendant's unauthorized use of ball valves manufactured by the Electric Boat Division of General Dynamics Corp. and the Worcester Valve Co., Inc.

## Background

Howard G. Freeman obtained a bachelor of science degree in mechanical engineering from Worcester Polytechnical Institute in June of 1940. Upon graduation, he was hired by the Rockwood Sprinkler Co. (hereinafter referred to as "Rockwood") of Worcester, Mass. He was later named director of research, and held that position until January of 1954.

On August 28, 1940, which was shortly after he began his employment at Rockwood, Freeman executed an employment agreement. The agreement provided in pertinent part that Freeman was—

\* \* \* to give to Rockwood the full benefit and enjoyment of any and all inventions or improvements which he may make while in the employ of Rockwood \* \* \* and all inventions which are made or worked out on the time and at the expense of Rockwood. \* \* \*

Said Freeman further agrees that he will without additional consideration disclose promptly to Rockwood all of the above-described inventions or improvements \* \* \*.

During the course of his employment at Rockwood, some 19 United States patents, as well as the foreign counterparts of these United States patents, naming Freeman as inventor or coinventor, were issued by the United States Patent Office. Freeman agreed to the assignment of all of his rights, title and interest in each of these patents to Rockwood.

As part of his duties as director of research, Freeman was primarily responsible for designing and improving all of Rockwood's products. He also had full authority, without the prior approval of any other company official, to submit

4. More exactly, the order stated in pertinent part:

"(1) defendant shall have 45 days from this date within which to file a supplemental answer, setting forth such defenses as it may wish to present on the question as to whether the inventors of the patent in suit are joined together in a manner irremediably contrary to applicable law, plus such defenses as it may wish to present pursuant to 28 [35] U.S.Code §§ 102 and 103, as to the effect of the Melichar patent on the validity of the patent in suit.

"(2) Plaintiff shall have 30 days after the filing of defendant's supplemental answer within which to file plaintiff's responsive pleading.

"(3) The case is remanded to a trial commissioner for a trial and report of his findings of fact and conclusions of law on the issues that may be raised by such supplemental pleadings, and

"(4) Defendant's motion to retry the issues of fact and law previously tried before and reported by a commissioner of this court is denied."

ideas which he believed to be novel to Rockwood's patent attorneys.

In turn, for his contributions, Freeman was included in Rockwood's "key man" program under which company executives received bonuses based upon Rockwood's earnings. At the time of his departure in 1954, Freeman's compensation, including bonuses, was about $25,000 annually.

While Rockwood's product line varied somewhat over the years, by the latter part of 1953 its principal products were sprinkler systems, fire fighting equipment, rescue equipment for airports, and ball valves. In 1953, ball valves constituted about 8 to 10 percent of Rockwood's total annual sales.

Rockwood manufactured single seat compression-type ball valves while Freeman was employed there. This type of ball valve utilized a seat on only one side of the ball. Since, in the operation of these valves, the ball was jammed by a spring or other device against an opposing seat and formed a compression seal, the valve seat was referred to as a "jam seat." While commercially successful, this type of ball valve had the disadvantage of only being able to control the flow of fluid adequately in one direction. Also, the "jam seats" on some valves would swell and cause the valves to leak. The swelling of a "jam seat" would also make a valve difficult to operate.

Beginning about 1945, Rockwood customers occasionally requested a ball valve which would be capable of controlling the flow of fluid through it in either direction. However, such a valve was never manufactured by Rockwood while Freeman was its director of research.

In the fall of 1953, while still director of research, Freeman became somewhat dissatisfied with his employment at Rockwood and discussed the possibility of going into the ball valve manufacturing business with a personal friend, Saul Reck. It was contemplated that Reck would manage the financial aspects of the new business and Freeman would contribute his engineering and design talents. After a number of meetings, Reck, who in the past had financed several new business ventures, obtained commitments of about $60,000 from several potential investors. The investors were apparently willing to take a chance with this new business venture on the understanding that there was a good market for ball valves.

On January 13, 1954, Freeman met with William J. Carroll, Rockwood's president, to express his dissatisfaction with his compensation and status at Rockwood. Freeman indicated that he would resign if something was not done. Freeman was told that he would be given an answer shortly. Failing to hear from Mr. Carroll by January 20, 1954, Freeman sent him a letter of resignation suggesting that his effective resignation date be January 30, 1954. Freeman's letter also indicated a willingness to serve an additional reasonable period or to have his resignation take effect sooner at Rockwood's option. On January 25, 1954, Mr. Carroll met with Freeman, and they agreed that Freeman would leave that afternoon. Freeman's employment and duties at Rockwood ended on that day.

Upon leaving Rockwood on January 25, 1954, Freeman called Mr. Reck and told him to do what was necessary to obtain the financing for the new company which they had earlier discussed. Jamesbury Corporation's Articles of Incorporation were drawn up on January 29, 1954. The contributions by the initial investors were in the form of checks made out to Jamesbury Corp. and postdated February 2, 1954.

On February 1, 1954, Freeman commenced a series of drawings and sketches of valve components. Some were undated, but none were begun before February 1, 1954. It took Freeman several days to complete the drawings and he did not complete any of them in a single day. While drawing and sketching during the first and second week of February, Freeman also began drafting a written description of three ideas he was working on. One of these ideas was

for a new valve seat. The written statement describing Freeman's new valve seat was completed before February 23, at which time the written description along with five illustrative sketches were taken to his patent attorney in Boston. The written description read in part:

> The new valve seat has both a flexible sealing surface and a non-flexible surface to absorb compression load. By utilizing the design as shown, the lip seal is precompressed before the ball surface strikes the non-flexible surface. The intent of the design is to maintain a definite space between the seat and the ball to allow for swelling.

On the basis of this meeting, the patent attorney prepared a draft of a patent application containing four claims and a drawing containing four figures. The drawings specifically showed a seal configuration which included a V-notch, substantially as shown in Fig. 5 of finding of fact 36, to provide for greater flexibility. The claims of the draft application covered this V-notch design. The oath accompanying the draft named Freeman as the sole inventor of the claimed subject matter.

On April 27, 1954, this draft was forwarded to Freeman to review but the trial transcript fails to indicate if Freeman ever signed it or filed it in the United States Patent Office. Accordingly, the draft claims cannot be taken as establishing the metes and bounds of the V-notch seat as envisioned by Mr. Freeman. Indeed, the most that can be said of them is that they set forth the patent attorney's understanding of what Mr. Freeman had invented.

In the latter part of March 1954, Freeman set up a lathe in space he had rented in Worcester, Mass., and started to make parts for his new valve. Shortly thereafter, he also set up apparatus to test the prototype valves he had made. Freeman's initial efforts at producing a

workable valve were unsuccessful and he continued to experiment with various modifications of his original V-notch design. He was particularly concerned about the valve seats tearing after only a few operations of a valve, but he was unable to successfully find a solution to this design defect.

Oscar Vaudreuil, since deceased, owned a machine shop in Worcester, Mass., which supplied Jamesbury Corp. with parts and services during 1954. Since Jamesbury Corp. had little cash to pay for these goods and services, Vaudreuil accepted stock in the corporation in lieu of money. Vaudreuil observed some of the tests being performed by Freeman. In order to overcome the seat tearing problem which Freeman's design was experiencing, Vaudreuil suggested that a small part of the metal casing behind the flexible valve seat be chamfered or cut away. This part of the metal casing is represented by 44 in Fig. 9 of the '666 patent (see finding 38). Adoption of the suggestion resulted in a valve seat that was free of the tearing defect that had plagued Freeman's earlier design.

An analysis of Vaudreuil's suggestion led Freeman to conclude that the chamfer provided lip flexibility, and that this necessary lip flexibility could also be obtained by cutting away one of the two lips of his V-notch valve seat instead of the more expensive and difficult chamfering of the metal casing. This modification of the valve seat was further refined into the design shown in Fig. 5 of the patent in suit (see finding 10).

In May 1954, Freeman returned to his patent attorney in Boston and described the changes that he and Vaudreuil had made to the valve. Freeman asked the patent attorney whether Vaudreuil was to be considered a coinventor and was told that he was.[5]

---

5. Defendant's contention, that plaintiff's failure to call the attorney as a witness gives rise to a presumption that the attorney's testimony would have been detrimental to plaintiff, is found to be unpersuasive. During pretrial discovery, the attorney was deposed by defendant. Moreover, defendant could have called the attorney as a witness at trial if it so desired. Under these circumstances, it is impossible to presume that the attorney's testimony would have favored defendant and been detrimental to plaintiff.

Plaintiff's attorney revised the previously prepared draft application. This revised draft was later filed at Patent Application Serial No. 436,188 (hereinafter referred to as the '188 application) by including therein the design change suggested by Vaudreuil as well as Freeman's modification thereof. More specifically, Fig. 8 of the application incorporates the chamfer which Vaudreuil had suggested while Fig. 7 shows an equivalent modification that resulted by Freeman's removal of one of the two lips of the original V-notch valve seat without chamfering the abutting casing.

*Misjoinder*

 While it is true that the inclusion of more or less than the true inventors in a patent renders it void, *Iowa State University Research Foundation, Inc. v. Sperry Rand Corp.*, 444 F.2d 406, 408 (4th Cir. 1971), there is a presumption that the inventors named in an issued patent are correct. *Acme Highway Products Corp. v. D. S. Brown Co.*, 431 F.2d 1074, *cert. denied*, 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971); *Mueller Brass Co. v. Reading Industries*, 352 F.Supp. 1357 (E.D.Pa.1972), *aff'd*, 487 F.2d 1395 (3d Cir. 1973). Thus, it is well established in this court that since misjoinder is a technical defense, it must be proven by "clear and convincing" evidence. *Garrett Corp. v. United States*, 422 F.2d 874, 190 Ct.Cl. 858, *cert. denied*, 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970). This is the law in other courts as well. *Acme Highway Products Corp. v. D. S. Brown Co., supra; Stein v. Biocoustics, Inc.*, 177 USPQ 680 (D.D.C. 1973); *Congoleum Industries, Inc. v. Armstrong Cork Co.*, 339 F.Supp. 1036 (E.D.Pa.1972).

 In the present case the threshold issue to be decided with respect to misjoinder is whether defendant has demonstrated, by clear and convincing evidence, that Vaudreuil did not make a significant enough contribution to Freeman's original V-notch to make Vaudreuil a coinventor of the subject matter of the claims in suit. As will hereinafter be explained, the evidence of record dictates that defendant has not so demonstrated.

The requirements of joint inventorship were stated in *Monsanto Co. v. Kamp*, 269 F.Supp. 818, 824 (D.D.C.1967):

A joint invention is the product of collaboration of the inventive endeavors of two or more persons working toward the same end and producing an invention by their aggregate efforts. To constitute a joint invention, it is necessary that each of the inventors work on the same subject matter and make some contribution to the inventive thought and to the final result. Each needs to perform but a part of the task if an invention emerges from all of the steps taken together. It is not necessary that the entire inventive concept should occur to each of the joint inventors, or that the two should physically work on the project together. One may take a step at one time, the other an approach at different times. One may do more of the experimental work while the other makes suggestions from time to time. The fact that each of the inventors plays a different role and that the contribution of one may not be as great as that of another, does not detract from the fact that the invention is joint, if each makes some original contribution, though partial, to the final solution of the problem.

The court went on, quoting from *DeLaski & Thropp Circular Woven Tire Co. v. Wm. R. Thropp & Sons Co.*, 218 F. 458, 464 (D.N.J.1914), *aff'd*, 226 F. 941 (3d Cir. 1915), to explain:

In order to constitute two persons joint inventors, it is not necessary that exactly the same idea should have occurred to each at the same time, and that they should work out together the embodiment of that idea in a perfected machine. The conception of the entire device may be due to one, but if the other makes suggestions of practical value, which assisted in working out the main idea and making it oper-

ative, or contributes an independent part of the entire invention, which is united with the parts produced by the other and creates the whole, he is a joint inventor, even though his contribution be of comparatively minor importance and merely the application of an old idea.

The difficulty experienced in attempting to define a standard to be used to determine who is a joint inventor and the type of contribution that is necessary to qualify as a coinventor is adequately illustrated in *Mueller Brass Co. v. Reading Industries, supra*, 352 F.Supp. at 1372:

> The exact parameters of what constitutes joint inventorship are quite difficult to define. It is one of the muddiest concepts in the muddy metaphysics of the patent law. On the one hand, it is reasonably clear that a person who has merely followed instructions of another in performing experiments is not a co-inventor of the object to which those experiments are directed. To claim inventorship is to claim at least some role in the final conception of that which is sought to be patented. Perhaps one need not be able to point to a specific component as one's sole idea, but one must be able to say that without his contribution to the final conception, it would have been less— less efficient, less simple, less economical, less something of benefit.

Moreover, it is necessary, as the court in *Mueller Brass Co. v. Reading Industries, supra*, 352 F.Supp. at 1373, recognized, to also consider the doctrine of "mere suggestions" which—

> * * * denies co-inventorship status to a person who suggests some way to improve an invention casually but takes no further role in fitting the rough suggestion into the scheme of the invention workably. *See Forgie v. Oilwell Supply Co.*, 58 F. 871 (3rd Cir. 1893).

The facts in the present case require the conclusion that Vaudreuil did make a contribution of very substantial importance to Freeman. In fact, before Vau-

dreuil made his contribution Freeman's valve proved to be marginally operable at best with the seats tearing after the ball of a valve had been turned only a few times. However, as a result of Vaudreuil's contribution, tearing of the valve seat was eliminated and plaintiff eventually produced a valve that gained widespread use and substantial commercial success. The facts demonstrate that Vaudreuil's contribution was of crucial importance to Freeman and that Vaudreuil must be considered a coinventor of the valves which incorporated his concept.

Since it is concluded that Vaudreuil did make a substantial contribution to the valve seat embodiments which followed Freeman's unworkable V-notch design, the next question requiring attention is whether the claims in suit cover only the joint invention. Defendant contends that the claims in suit not only cover the joint invention, but they cover as well the original Freeman invention. If the former is true, then there is no misjoinder. On the other hand, if the latter is found to be true, there is misjoinder. In any event, in order to properly resolve this issue, it becomes necessary to establish the scope of claims 7 and 8. In *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871 (1917), the Supreme Court stated that: "The scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specification." More recently, the Supreme Court reiterated that position in *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966), when it stated: " * * * it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." *See also Tate Engineering, Inc. v. United States*, 477 F.2d 1336, 1340, 201 Ct.Cl. 711, 719 (1973).

The Supreme Court has also stated that " * * * an invention is to be construed not only in light of the claims, but also with reference to the file wrap-

per or prosecution history in the Patent Office." *Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed.2d 545 (1966). This direction has been followed by a number of courts, including: *Ellipse Corp. v. Ford Motor Co.*, 452 F.2d 163 (7th Cir. 1971), *cert denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972); *Waldon, Inc. v. Alexander Mfg. Co.*, 423 F.2d 91 (5th Cir. 1970). Indeed, this court's own pronouncement in *Autogiro Co. of America v. United States*, 384 F.2d 391, 181 Ct.Cl. 55 (1967), stresses that the claims of a patent are necessarily construed in connection with the other parts of the patent instrument, as well as the circumstances surrounding the prosecution of the patent application through the Patent Office.

An analysis of the 10 claims contained in the originally filed '188 application indicates that claims 1 through 8 were sufficiently generic to read on the original Freeman valve design, as well as upon the Freeman-Vaudreuil joint invention. Claims 9 and 10 only covered embodiments which were jointly invented by Freeman and Vaudreuil, and did not read on the Freeman V-notch. The '188 application was filed in the joint names of Freeman and Vaudreuil on June 11, 1954.

As a result of a first amendment to the '188 application, Freeman and Vaudreuil canceled claims 6, 7, and 8 of the original 10 claims. By a second amendment, claims 1–5, 9 and 10 were canceled and new claims 11–13 added. As explained in the remarks accompanying the amendment, "Claim 11 corresponds in substance to Claim 10 * * *." Claim 10, as hereinbefore stated, originally read only on the joint Freeman-Vaudreuil invention. Similarly, since new claims 12 and 13 were dependent upon new claim 11, there can be no doubt that the joint inventors ultimately limited all of the claims in that application to the joint invention.

On February 14, 1958, the joint inventors filed a continuation-in-part application, Serial No. 715,372 (hereinafter referred to as the '372 application) with the Patent Office. The drawings of this application illustrated only the joint Freeman-Vaudreuil invention, and did not illustrate the original Freeman V-notch. Specifically, Figs. 5 and 6 of the '188 application, which illustrated the Freeman V-notch design, were not included in the '372 application. In addition, Figs. 2 and 4 of the '188 application were modified by eliminating the Freeman V-notch seat and substituting therefor the joint Freeman-Vaudreuil seat. Furthermore, new Figs. 5–7, depicting only the joint invention, were added.

The specification of the '188 application was extensively revised and its entire emphasis changed. The new specification dealt almost exclusively with the joint invention while relegating the V-notch to a four sentence discussion. Furthermore, as a result of the use of the term "free standing lip" in each of the 10 claims filed with the application, all claims read only on the joint invention and not on the Freeman V-notch.

In response to a Patent Office rejection of the '372 application over the parent '188 application, the '188 application was abandoned.

By subsequent amendment, applicants presented new claim 14 to the Patent Office. This claim, which eventually matured into claim 7 of the patent in suit, did not contain the term "free standing lip" and hence might be construed, if viewed in the abstract, as reading on the Freeman V-notch design. However, it is clear from the prosecution history that there was no intent on the part of Freeman and Vaudreuil to broaden the coverage of claims 7 and 8 by the elimination of the term "free standing lip." Certainly, the acts of the applicants in prosecuting both the '188 and the '372 application in the Patent Office dictate against any intent on the part of the joint inventors to cover the V-notch design by claims 7 and 8.

Specifically, since the applicants had narrowed the claims in their parent '188 application, and, as well, restricted all of the original 10 claims in the '372 application, in view of prior art cited by the

Patent Office to exclude the Freeman V-notch design, it would be improper to permit them, by way of the later submitted claim 14 in the '372 continuation-in-part application, to recapture subject matter that they had willingly relinquished. To do so would ignore the well-established doctrine of "file wrapper estoppel" which does not allow recapture of relinquished subject matter under circumstances present in this case. *Exhibit Supply Co. v. Ace Patents Corp.*, 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942); *Hughes Tool Co. v. Varel Manufacturing Co.*, 336 F.2d 61 (5th Cir. 1964).

Thus, it must be concluded that Vaudreuil is properly considered to be a coinventor with Freeman of the invention disclosed by claims 7 and 8 of the patent in suit, and that these claims do not cover the Freeman V-notch valve seat. Thus, there is no misjoinder of inventors present in this case.

### Validity

In addition to its defense of misjoinder, defendant also contends that the '666 patent is invalid. In support of its contention of invalidity, defendant, at the latest trial, relied on the Melichar, *et al.*, and Cross patents. Title 35 U.S.C. § 282 provides that a patent is presumed to be valid and the burden of establishing invalidity rests upon the party asserting it. However, numerous courts have concluded that the failure of the Patent Office to consider important prior art references during its evaluation of the pending application is enough to overcome the statutory presumption of validity of an issued patent. *See T. P. Laboratories v. Huge*, 371 F.2d 231 (7th Cir. 1966).

Defendant contends that claims 7 and 8 of the '666 patent are invalid by reason of their failure to meet the requirements of patentability set forth in 35 U.S.C.

§ 103.[6] In *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court indicated that an analysis of the following factors is required in resolving whether or not a patent meets the requirements of patentability set forth in 35 U.S.C. § 103—

(1) the scope and content of the prior art;

(2) the difference between the prior art and the claims in issue; and

(3) the level of ordinary skill in the pertinent art.

Secondary considerations, such as commercial success, satisfying a long-felt need, and the failure of others, are also relevant considerations in evaluating patentability under 35 U.S.C. § 103.

■ The above factual determinations must be made without resorting to the teaching of the patent at bar or the deceptive and oftentimes unwitting use of hindsight. *See Garrett Corp. v. United States*, 422 F.2d 874, 190 Ct.Cl. 858 (1970), *cert. denied*, 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970).

■ For reasons which follow, it is concluded that neither the Melichar, *et al.*, nor Cross patents, considered individually or in combination, disclose a ball valve having a sealing ring with the structure and functional features required to perform the intended purposes of the ball valve defined by claims 7 and 8 of the '666 patent.

As explained in considerable detail in the findings, neither of the prior art patents deal with valves that control the flow of fluid in both directions through a ball. Neither Melichar, *et al.*, nor the Cross patents were concerned with a valve that was capable of controlling fluid passage through an apertured ball by a quarter turn of said ball. Accordingly, no attention was given, and no structure provided, to insure against the

---

**6.** 35 U.S.C. § 103 provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

flexible lip of either Cross or Melichar, *et al.*, being lodged into the fluid port of an apertured ball valve such as used by the patented structure in suit.

The lodging of the lip into the fluid port would not only prevent the valve from being able to be completely turned into its on or off positions, but could result in complete inoperativeness of the valve if the lip were cut off in the movement of the ball valve between its open and closed conditions.

Moreover, neither of the prior art references teach the use of a lip seal or seals to totally support a ball valve in the manner disclosed by the Freeman-Vaudreuil patent. In addition, neither Cross nor Melichar, *et al.*, disclose a lip which has a tapered cross-sectional shape in its radial direction to give the lip graduated stiffness, and, at the same time, provide a support surface for a ball valve over and above that initially provided by the lip that is subjected to additional fluid pressure when the ball valve is in its closed position.

Finally, neither Cross nor Melichar, *et al.*, were concerned with and thus failed to provide the necessary structure, as the '666 patent did, to solve the problems of temperature variation, pressure variation and valve wear, or to compensate for swelling of the valve seats.

Defendant also contends, in the event the court finds that there has been no misjoinder, that the subject matter of claims 7 and 8 of the patent in suit is obvious over the Freeman V-notch design. Although plaintiff questions whether the Freeman V-notch can be used as prior art against the joint invention covered by claims 7 and 8, the following cases support defendant's position: *In re Bass*, 474 F.2d 1276 (Cust. & Pat.App.1973); *Sutter Products Co. v. Pettibone Mulliken Corp.*, 428 F.2d 639 (7th Cir. 1970); *Grinnell Corp. v. Virginia Electric & Power Co.*, 277 F.Supp. 507 (E.D.Va.1967).

However, after a careful review of the facts hereinbefore stated, and from a review of the entire trial record,

it must be concluded that defendant has failed to show that it would be obvious to one of ordinary skill in the art to modify the Freeman V-notch either by cutting a chamfer in the casing or by removal of the lip adjacent to the casing. In fact, the surprisingly superior results obtained when Vaudreuil's contribution was effected speak to the nonobviousness of it. *United States v. Adams, supra.* Thus, upon incorporation of the Vaudreuil contribution into the valve, an inoperable device was changed into a commercially successful product. The unexpected superiority obtained by modifying the Freeman V-notch as plaintiff's did belies defendant's contention and it, therefore, must be concluded that claims 7 and 8 of the patent in suit are unobvious over the original Freeman V-notch design.

In conclusion, it is specifically found that claims 7 and 8 define a patentable invention which was jointly invented by Messrs. Freeman and Vaudreuil, and that the invention defined by said claims would not have been obvious to a person of ordinary skill in the art at the time that the joint invention was made.